UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ASAD GILANI,

                                        Plaintiff,

          - against -

TENEO, INC., PIERS CAREY, RACHEL HEAD,
BRETT AYRES, STEVE EVANS, and TENEO
USA, INC.,

                                        Defendants.
-------------------------------------------------------------x

**OPINION & ORDER**

No. 20-CV-1785 (CS)

<u>Appearances</u>:

Asad Gilani
Armonk, New York
*Pro Se Plaintiff*

Laura L. Rubenstein
Marc A. Campsen
Wright, Constable & Skeen, LLP
Baltimore, Maryland

Jane B. Jacobs
Klein Zelman Rothermel Jacobs & Schess LLP
New York, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

        Before the Court are the parties' cross-motions for summary judgment.  (Docs. 151, 163.)

For the following reasons, Defendants' motion is GRANTED in part and DENIED in part, and

Plaintiff's motion is DENIED.

## I.        **BACKGROUND**

        This case arises out of the alleged discrimination and retaliatory termination that Plaintiff

Asad Gilani claims to have experienced at his former workplace, Teneo, Inc. ("Teneo").

A.    **Facts**

The following facts are based on the parties' Local Civil Rule 56.1 Statements,

responsive 56.1 Statements, declarations, and supporting materials.[1]   The facts are undisputed

except as noted.

1.    **Plaintiff's Hiring at Teneo**

Teneo provides technology solutions along with software and hardware produced by

several manufacturing partners.  (Doc. 154 ("Ds' 56.1 Stmt.") ¶ 1.)  Its operations are based in

Virginia and the United Kingdom.  (*Id.* ¶ 2; *see* note 1 above.)

Plaintiff was born in Pakistan in 1956 and is Muslim, and he describes his race as "Asian-

Middle East."  (Ds' 56.1 Stmt. ¶ 4; *see* note 1 above.)  In August 2016, Vice President of Human

---

[1] Plaintiff's responsive 56.1 Statement, (Doc. 182-1 ("P's 56.1 Resp.")), fails to comply with item 2.C.i of my Individual Practices, which requires the opposing party to reproduce each entry in the moving party's Rule 56.1 Statement before setting out its response thereto. Plaintiff's failure to reproduce Defendants Rule 56.1 Statement defeats the purpose of my individual practice, which is designed to obviate the need to go back and forth between the two Rule 56.1 Statements.

Plaintiff's responsive 56.1 Statement does not address paragraphs 1, 2, 4, 47, 53, 58-59, 64-66, 71, 82-94, 96-108, 110-121, 123-124, 143-146, 154, and 157 of Defendants' 56.1 Statement, so the Court deems any properly supported facts in those paragraphs admitted.

Plaintiff did not submit a proper 56.1 Statement in support of his cross-motion.  That alone would justify denial of the cross-motion, *see, e.g.*, *Antwi v. Health & Hum. Sys. (Ctrs.) F.E.G.S.*, No. 13-CV-835, 2014 WL 4548619, at *5 (S.D.N.Y. Sept. 15, 2014), but in light of Plaintiff's *pro se* status I will not deny his motion on that ground.  To the extent Plaintiff may have intended a document entitled "Plaintiff's Declaration in Motion of Partial Summary Judg[]ment Against Defen[d]ants and Against Defendants Summary Jud[]g[]ment," (Doc. 172 ("P's Decl.")), to be his 56.1 Statement, I do not regard it as such (despite his certification of service, on page 30 of that document, referring to the document as "Local 56.1 Statement of Undisputed Facts").  It is full of argument, insults, irrelevancies, conclusions, tangents and descriptions of events the significance of which is unexplained and incomprehensible. Defendants, who argue that the Court should disregard the document for failure to comply with Local Rule 56.1(a), (Doc. 194 ("Ds' Opp.") at 2), will not be penalized for failing to respond to it, as that would have been essentially impossible.  But, granting Plaintiff special solicitude, I will consider any properly supported facts in his Declaration.

Resources Rachel Head and Senior Vice President of Solutions Engineering Steve Evans

interviewed Plaintiff for a solutions engineer position at Teneo and recommended to CEO Piers

Carey that Teneo hire Plaintiff, which Carey approved.  (Doc. 154-1 ("Carey Aff.") ¶ 6; Doc.

154-5 ("Head Aff.") ¶¶ 3-4; Doc. 154-6 ("Evans Aff.") ¶¶ 3-4.)[2]  Plaintiff received an offer letter

from Head shortly thereafter, which specified that his position was solutions engineer and that he

would report to Evans on Teneo's U.S. Technical Team.  (Doc. 154-7.)  Plaintiff began working

for Teneo on September 26, 2016 (shortly before his sixtieth birthday) from his home in

Armonk, New York.  (P's 56.1 Resp. ¶ 4.)  As a solutions engineer, Plaintiff provided "pre-

sales" technical support for products; he was not responsible for managing any Teneo

employees.  (Id. ¶¶ 4, 6; Doc. 154-2 at 74:5-15.)

## 2. Complaints About Plaintiff

Over the course of Plaintiff's employment at Teneo, Evans received numerous

complaints about Plaintiff's behavior.  On February 7, 2017, Evans received a forwarded email

from the sales manager for one of Teneo's partners.  (Doc. 154-10.)  The sales manager wrote

that he was "uncomfortable" with what he was seeing from Plaintiff, who was not "thinking

through things or taking time before saying things or sending e-mails."  (Id. at TI-000161.)  As a

---

[2] Plaintiff disputes this and asserts that a Teneo employee named Scott Gibson decided to hire him.  (P's 56.1 Resp. ¶ 2.)  For support, Plaintiff cites paragraph two of his Declaration, which, in turn, cites several exhibits that do not support that proposition.  (See P's Decl. ¶ 2.)  I will assume, as Plaintiff asserts, that Gibson interviewed him, but Plaintiff does not dispute that Head and Evans also interviewed him and that Carey approved the decision to hire him.  (Ps' 56.1 Resp. ¶ 2.)  Confusingly, although Plaintiff states that Evans interviewed him on August 24, 2016, (id.; see Doc. 180-18 at 41:14-18), Plaintiff also asserts that Evans did not pick up his phone during Plaintiff's interview, because a white, non-Muslim employee who was not from Pakistan had a heart attack, (P's Decl. ¶¶ 5, 9; Doc. 171 ("P's Mem.") at 5, 9, 22, 26-27; Doc. 180-18 at 41:14-18).  The Court cannot discern what is wrong with a supervisor missing a call because he is attending to a sick employee, or why Plaintiff believes this episode to be indicative of discrimination.

result of Plaintiff's conduct, the sales manager feared he would miss an opportunity, and he requested that others take the technical lead on the project rather than Plaintiff.  (*Id.*)

On March 20, 2017, Plaintiff sent an email asking to be excluded from any account planning and stating that he was not interested in sharing his contacts.  (Doc. 154-11 at TI-000166.)[3]  Evans replied that Plaintiff did not need to share his personal contacts, but reminded Plaintiff that he could not engage personal contacts on Teneo's behalf and that he needed to go through a sales representative instead.  (*Id.* at TI-000165.)

On April 26, 2017, Plaintiff notified Evans that he would be out of the office, and Evans emailed Plaintiff the procedure for taking days off for a "family emergency," adding that he "hope[d] everything [wa]s ok."  (Doc. 154-14 at TI-00469.)  Evans's email explained that Plaintiff could get compassionate leave for the death or serious illness of a family member; that if the emergency leave was for other reasons, Plaintiff would need to disclose some details to receive paid leave; and that if he preferred not to share any details, Plaintiff could instead take a vacation day.  (*Id.*)  Plaintiff replied (copying Head) that patient privacy laws prevented Evans from asking for details and that he would take a vacation day.  (*Id.* at TI-00468.)  Evans responded that he was not asking Plaintiff to disclose any private medical information and he simply wanted more details about the nature of the emergency so that he could determine what type of leave was appropriate.  (*Id.* at TI-00467 to 68.)  Evans suggested that Plaintiff could share the details with Head if he felt uncomfortable disclosing them to Evans, and stated that Plaintiff was under no obligation to provide any additional information if he still wanted to use a vacation day.  (*Id.*)  Plaintiff replied, adding Carey to the thread, and wrote that Evans's conduct

---

[3] Plaintiff asserts that he did not refuse to participate in account planning but does not dispute that he sent this email.  (*See* P's 56.1 Resp. ¶ 9.)

was "sad" and a "disgrace," and that the way Teneo treated its employees was "a shame."  (*Id.* at TI-00467.)  Evans wrote back, commending Plaintiff for his hard work, expressing his hopes that Plaintiff's family emergency would work out well, and offering Plaintiff a paid day of leave instead of a vacation day.  (*Id.*)  Evans did, however, note that he was concerned about Plaintiff's "accusatory statements" about Teneo and suggested that a discussion with Head would be helpful to "clear the air."  (*Id.*)  Plaintiff replied that he was not interested in having a discussion with Head and repeated his comments that Evans's conduct was "sad" and a "disgrace."  (*Id.* at TI-00466.)

On April 27, 2017, Evans completed a performance review of Plaintiff.  (Doc. 154-12.)[4] In his review, Evans wrote that Plaintiff needed to work on teamwork and respect.  (*Id.* at TI-00340.)  As an example, Evans noted that he had observed Plaintiff telling others what to do instead of asking them or working collaboratively with them, and he added that people felt bullied by Plaintiff.  (*Id.*)  Evans noted that refusing to participate in account planning hurts the business and team relationships, and he reiterated that although Plaintiff did not need to share his personal contacts and was not being asked to do so, Plaintiff could not engage personal contacts on behalf of Teneo directly and needed to go through the sales team instead.  (*Id.* at TI-00340 to 41.)  Evans also wrote that he had spoken to Plaintiff about the February email from the sales manager, and that Plaintiff denied the incident and blamed the sales manager for it.  (*Id.* at TI-

---

[4] Plaintiff disputes the accuracy of this review.  (*See* P's Decl. ¶ 87.)  Specifically, he asserts that the goals at Teneo differed from quarter to quarter, and he argues that because this review contains some of the same goals as the previous quarter, it must have been modified at some unspecified time.  (*See id.*)  The Court has reviewed Plaintiff's record cites, and they do not support this proposition.  Regardless, the Court is not considering Evans's comments for their truth, but rather for the fact that they were made.  And even if I were to disregard the review entirely, it would not affect the outcome of the case, because the substance of the comments was repeated in other documents the authenticity of which is not disputed, such as the May 23 email discussed below.  (*See* note 5 and accompanying text.)

00341.)  Evans noted that Plaintiff needed to improve his relationship with partners, allow the

sales team to lead calls and sales strategy, and be more receptive to feedback and constructive

criticism.  (*Id.*)

Defendants assert that Evans received several additional complaints about Plaintiff,

which I will not describe because Plaintiff disputes the truth of them.  (*See* Ds' 56.1 Stmt. ¶¶ 19,

26-32; P's 56.1 Resp. ¶¶ 8, 14.)  The upshot is that they culminated in Evans emailing Head and

Carey on May 23 about Plaintiff's various behavioral problems.  (*See* Doc. 154-16.)[5]  Evans

wrote that he had spoken to Plaintiff over the phone, but "could not seem to get [Plaintiff] to

understand some of the issues around the value of respect with regards to dealings with partners

and others at Teneo."  (*Id.* at TI-00558.)  As an example, Evans described how he had observed

Plaintiff bullying an engineer at a partner company.  (*Id.*)  Evans also recounted the behavioral

issues noted in Plaintiff's performance review, described above.  (*See id.*)  Evans wrote, "I will

continue to work with [Plaintiff] to see if we can get these things inline as it would be a shame to

lose someone with such strong technical capabilities."  (*Id.* at TI-00559.)

In October 2017, Plaintiff posted a picture on LinkedIn of himself with Teneo customers

who had purchased Cisco products.  (Evans Aff. ¶ 27; Doc. 163-12 at 24.)[6]  According to Evans,

one of Teneo's partners – a Cisco competitor – observed the post and complained to Evans.

(Evans Aff. ¶ 28.)  This led Evans to call Plaintiff to tell him not to post about Teneo's customers

without approval, which Evans then memorialized in an email to Plaintiff.  (Doc. 154-18 at TI-

00636.)  Plaintiff agreed to Evans's terms but noted that he had "started to block [the] Teneo

---

[5] Plaintiff disputes the veracity of the complaints about him but not the fact that they were
conveyed to Head and Carey.  (*See* P's 56.1 Resp. ¶ 15.)

[6] Cites to nonconsecutively paginated docket materials refer to the page numbers
generated by the Court's Electronic Case Filing system.

Team from LinkedIn."  (*Id.* at TI-00635 to 36.)  Evans forwarded the email to Head (changing

the subject line from "RE:  Linked-in" to "Linked-in Asad explosion in progress"), updated her

about the upset partner, and asked for her input on a draft response.  (*Id.* at TI-00635.)  He noted

that if Plaintiff refused to unblock Teneo on LinkedIn, he would "have to look at this as his

determination to leave the company."  (*Id.*)  According to Evans, Plaintiff ultimately agreed to

unblock Teneo.  (Evans Aff. ¶ 32.)  Plaintiff asserts that he did not unblock Teneo.  (P's 56.1

Resp. ¶ 34.)

On June 14, 2018, Evans posted on another social networking site about the technical

requirements for a product and asked to speak to Plaintiff "offline" about them.  (*See* Doc. 154-

19.)  Plaintiff replied on the site that "you have to be a Network Professional to understand" the

product.  (*Id.*)  Evans emailed Plaintiff about the reply, letting him know that he "had specifically

said that we would discuss it [offline]" and that he "also found [Plaintiff's] reply disrespectful."

(*Id.*)

In July 2018, the winners of Teneo's "CEO Club," a performance incentive program with

a trip to Iceland as a reward, were announced.  (Doc. 154-39 at TI-00617-18; Ds' 56.1 Stmt.

¶ 154; *see* note 1 above.)  The criteria for non-sales personnel such as Plaintiff were

(1) "[a]chievement against objectives," (2) "[s]ubscription to the Teneo values," and

(3) "[g]enerally doing a wonderful job!"  (Doc. 154-39 at TI-00618.)  Plaintiff was nominated

for the CEO Club but did not win.  (*Id.* at TI-00622 to 23.)  According to Plaintiff, Evans

recommended a white, non-Muslim, non-Pakistani, younger employee over Plaintiff for the CEO

Club.  (P's Decl. ¶ 91.)  Among the ten winners were a Muslim employee of Pakistani descent

and an employee who was slightly older than Plaintiff.  (Carey Aff. ¶¶ 13-14; Doc. 154-39 at TI-

00620, TI-00628.)[7]  This was the only year Plaintiff was eligible for the CEO Club.  (Ds' 56.1

Stmt. ¶ 157; *see* note 1 above.)

### 3.    2019 Position Changes

In January 2019, Brett Ayres was appointed to the position of global SD-WAN[8] practice

director and began managing five Teneo employees in Europe, the Middle East, Africa

("EMEA"), and the United States, including Plaintiff.  (Ds' 56.1 Stmt. ¶ 53; P's 56.1 Resp. ¶ 22;

*see* note 1 above.)  Ayres had joined Teneo in 2013 as a sales manager in the United Kingdom,

where he managed nine senior account managers.  (Ds' 56.1 Stmt. ¶ 47; *see* note 1 above.)  In

2016, he started working as technical sales manager of EMEA, and he managed five sales

engineers (the U.K. equivalent of solutions engineers) in that position.  (Ds' 56.1 Stmt. ¶ 47; *see*

note 1 above.)

According to Carey, Ayres was appointed global SD-WAN practice director after Ayres's

old position was eliminated as part of a restructuring.  (Carey Aff. ¶ 16.)  Carey asserts that no

other individuals were considered and that no applications were solicited or received for this new

position.  (*Id.* ¶ 17.)  Carey also states that the position was intended to and did remain U.K.-

based, and that it was a lateral change for Ayres rather than a promotion.  (*Id.* ¶¶ 20-21.)[9]

---

[7] Plaintiff asserts that these employees had different supervisors, but he does not dispute
that one was Muslim and of Pakistani descent and the other was older than he.  (*See* Ds' 56.1
Stmt. ¶¶ 155-156; P's 56.1 Resp. ¶¶ 42-43.)

[8] "SD-WAN" is short for "software-defined wide area network."  (Ds' 56.1 Stmt. ¶ 15
n.2.)

[9] Plaintiff characterizes Ayres's new position as a promotion based on Ayres's deposition
testimony.  (P's 56.1 Resp. ¶ 22.)  But Plaintiff cites his own statement during his questioning of
Ayres; Ayres's answer confirmed that Ayres did not have a particular certification, not that he
was promoted.  (*See* Doc. 180-13 at 31:20-32:5 ("Q:  During that time you did not have Meraki
during that time; correct?  A:  (Audio inaudible.)  Court Reporter:  Sorry to interrupt.  Apologies.
I didn't get your full question.  It trailed off.  Can you repeat?  Q:  Yeah, when he was promoted

According to Carey, Ayres "had an exemplary employment history at Teneo and none of Plaintiff's documented conduct issues." (*Id.* ¶ 21.)

According to Plaintiff, he had spoken to Carey about the position at a company meeting in July 2018. (Doc. 180-20 at 127:2-8.) Plaintiff told Carey that he was interested in the position, and Carey said that he would get back to him but never did, even after Plaintiff reminded him in December 2018. (*Id.* at 127:2-128:16.) According to Plaintiff, Ayres – who Plaintiff asserts is younger, white, British, and non-Muslim, (P's 56.1 Resp. ¶ 23; P's Decl. ¶ 93) – was less qualified for the position because Ayres was a "sales guy" with less technical experience, (Doc. 180-20 at 133:12-15). For support, Plaintiff points to the fact that Ayres attended a product training session that Plaintiff did not need to attend because Plaintiff already had years of experience with the product. (*Id.* at 129:21-130:20.) Ayres testified that he had been working with SD-WAN technology since he joined Teneo in 2013. (Doc. 180-13 at 31:7-32:8.)[10]

Around the same time that Ayres was appointed to his new position in January 2019, Plaintiff was promoted from solutions engineer to solutions architect. (Doc. 154-2 at 58:6-10, 60:12-20.)[11] Plaintiff described this position as a consultant role that focused more on software

_____

he did not have Meraki. During that time he did not have Meraki certificate. A: That's correct.").)

[10] Plaintiff asserts that Ayres had only two years' experience with SD-WAN, but the portions of the record that he cites do not support that proposition. (*See* P's 56.1 Resp. ¶ 23.) To the extent Plaintiff intended to cite Exhibit Z7, the Affidavit of Doug Houghton, that affidavit also fails to support the propositions for which it is cited. (*See id.*; Doc. 179-7.)

[11] In his Declaration, Plaintiff asserts that the solutions architect position was a lateral move and not a promotion, (P's Mem. at 20; P's Decl. ¶ 13), but the evidence he cites does not support that proposition, and he testified at his deposition that the solutions architect position was a promotion, (Doc. 154-2 at 58:6-10, 60:12-20).

networks and less on pre-sales and hardware sales than his previous role. (*Id.* at 63:1-10.) The position also involved less travel and was mostly remote. (*Id.* at 187:6-16.)

### 4. Plaintiff's Termination

On Friday, June 14, 2019, Evans emailed Head to tell her that he had been told by a colleague that two sales representatives had asked for "an engineering resource other than [Plaintiff]" because Plaintiff made "negative statements about Teneo in front of partners and has indicated management doesn't know what they are doing and he [is] interviewing." (Doc. 154-22 at TI-000197.)[12]  Plaintiff had purportedly said that one client was "not a Teneo account" but was "his account" and that the sales representatives needed "to go through him." (*Id.*)  Plaintiff had also allegedly said that the company worked with another client only because of him, not Teneo, and "if I go, they go." (*Id.*)  Plaintiff had apparently also indicated that he was not selling the products of one of Teneo's partners. (*Id.*)  Head added Carey to the email chain and told Evans to investigate. (*Id.* at TI-000196.)

That same day, Evans spoke to the sales representatives and confirmed their complaints about Plaintiff's behavior. (Ds' 56.1 Stmt. ¶ 66; *see* note 1 above.)  He emailed Head and Carey about his findings and wrote:

> Normally, we would have a call with [Plaintiff] Monday to get his side, explain that this behavior is not acceptable, and implement a [performance improvement plan].  However, I really think his behavior is toxic to the team . . . .  He apparently is very good at telling his managers what they want to hear, but he slipped up in revealing his true self to his co-workers.  I'm of the o[pi]nion that once validated, we need to let him go, or encourage him to take a position elsewhere if that is what we prefer.

---

[12] Plaintiff disputes most of the underlying conduct described in the email but does not dispute that this information was conveyed to Evans, Head, and Carey. (*See* P's 56.1 Resp. ¶¶ 39-41.)  Plaintiff admits that he said, "Teneo CEO Piers Carey did not know what he was doing." (P's Decl. ¶ 125.)

(Doc. 154-22 at TI-000195.)  Carey replied that he had spoken to yet another Teneo employee who requested not to work with Plaintiff because he could not trust him to support the products of one of Teneo's partners.  (*Id.* at TI-000194.)

On Monday, June 17, 2019, Head responded that she had checked Teneo's "legal obligations relating to [Plaintiff] in New York state and drafted a termination letter and settlement agreement."  (*Id.*)  The draft provided that Plaintiff's termination would be effective June 18 and that Plaintiff had until June 21 to accept his severance package.  (Doc. 154-25 at TI-00507 to 08.)[13]  Head asked Evans to talk to Plaintiff to raise the complaints with him and get his side of the story, and then set up a call with all three of them regarding the "action to be taken."  (Doc. 154-22 at TI-000194.)

The next day – Tuesday, June 18 – Evans replied with a summary of his call with Plaintiff.  (*Id.* at TI-000193.)  Evans wrote that Plaintiff did not think he had done anything wrong, defended everything he had said on the grounds that he was just voicing his opinion, and denied that he was interviewing for other jobs.  (*Id.*)  Per Evans's notes from the call, Plaintiff indicated that if Teneo was going in the "wrong direction," he could leave the company, and that

---

[13] The termination letter dated June 18 was never provided to Plaintiff, for reasons discussed below.  Plaintiff asserts that the decision to terminate him was not made until June 21 (after he had complained of discrimination) because the document properties for the termination letter he eventually received on June 26 show that it was drafted on June 21.  (P's Mem. at 21; P's Decl. ¶ 23; *see* Doc. 163-4 at 24.)  The Court does not see what the creation date of Plaintiff's June 26 termination letter has to do with the creation date of his June 18 termination letter, which he never received and the content of which differs significantly from the content of the June 26 letter.  (*Compare* Doc. 154-25 at TI-00507, *with* Doc. 154-31 at TI-00491.)  Plaintiff has not produced any evidence that calls into question the creation date of the June 18 termination letter.  In any event, Plaintiff does not dispute that Head stated on June 17 that she had drafted Plaintiff's termination letter and settlement agreement, or that both letters exist within Teneo's records.

Teneo had to decide if a certain project was "just about money or reputation" because "[i]f it's just money, it's not for [Plaintiff]." (*Id.*)

After the call, Plaintiff emailed Head and told her that on March 29, 2019, Dan Sabol (a solutions engineer) had yelled at Plaintiff on a call, "was very abusive," and had called himself a "Red Neck." (Doc. 154-26 at TI-00497; Ds' 56.1 Stmt. ¶ 82; *see* note 1 above.)[14]  Plaintiff noted that other Teneo employees were from the South as well, and he wrote:  "This is a discrimination against me as a Muslim and Pakistani and Old.  This needs to be corrected and I plan to file EEOC report against Teneo." (Doc. 154-26 at TI-00497.)[15]  Plaintiff also forwarded messages he had exchanged with Sabol on March 29, in which Sabol apologized to Plaintiff and said they could "handle this like men" and "work through this….without intervention from others." (*Id.* at TI-00498 (ellipsis in original)).  Plaintiff responded that he would call him to discuss but that Sabol could not "raise [his] voice and abuse [Plaintiff]." (*Id.*)  This June 18 email was the first time that Plaintiff notified anyone at Teneo about this alleged incident, and it was also the first time that Plaintiff notified anyone at Teneo about an EEOC complaint.  (Ds' 56.1 Stmt. ¶¶ 83, 86; *see* note 1 above.)

Head forwarded the email to Carey and Evans and told them, referring to the termination call she planned to have with Evans and Plaintiff, that she "was all set to go with the meeting, having drawn up a settlement agreement, and then received this email from [Plaintiff].  I am awaiting legal advice so we may not be able to go ahead at 8pm Steve." (Doc. 154-26 at TI-00497.)  Based on Plaintiff's allegation against Sabol, Teneo decided to delay Plaintiff's

---

[14] In his email, Plaintiff spells Sabol's name "Sobel," but based on the parties' submissions, the correct spelling appears to be "Sabol."  (*See, e.g.*, Ds' 56.1 Stmt. ¶ 82; P's Decl. ¶ 29.)

[15] "EEOC" refers to the Equal Employment Opportunity Commission.

termination and investigate.  (Ds' 56.1 Stmt. ¶ 87; *see* note 1 above.)  Accordingly, Head

emailed Plaintiff "to schedule a call . . . as soon as possible to gain a greater understanding," and

noted that she was "concerned to hear that [he felt] discriminated against" and that she took his

"allegations very seriously."  (Doc. 154-27.)

On June 20, Head spoke to Plaintiff over the phone about his allegations.  (Ds' 56.1 Stmt.

¶ 89; *see* note 1 above.)  Plaintiff said that he found Sabol's use of the term "redneck" offensive

because he believed that a "redneck" is a racist white supremacist.  (Doc. 154-28 at TI-000207;

Ds' 56.1 Stmt. ¶ 91; *see* note 1 above.)  Plaintiff said that he did not accept the apology that

Sabol offered on March 29 but that he did not notify anyone about the incident because he

wanted to give Sabol the chance to put things right.  (Doc. 154-28 at TI-000207; Ds' 56.1 Stmt.

¶ 92; *see* note 1 above.)  Although Plaintiff would later allege that Sabol had called him a "Paki,"

(Doc. 154-3 at TI-00355; Doc. 94 ("SAC") ¶ 67), it is undisputed that during this call, Plaintiff

did not tell Head that Sabol used that slur, (Ds' 56.1 Stmt. ¶¶ 93, 101; *see* note 1 above).

During the phone call, Plaintiff also raised three additional instances of alleged

discrimination.  He complained that Ayres let two other employees attend a Cisco conference but

declined Plaintiff's request to attend because Plaintiff is Muslim, Pakistani, and old.  (Doc. 154-

28 at TI-000207; Ds' 56.1 Stmt. ¶ 96; *see* note 1 above.)  Plaintiff also complained about an

occasion when Ayres and Sabol attended a Silver Peak training without Plaintiff, which Plaintiff

viewed as discriminatory in light of Plaintiff's forty years of experience with the product.  (Doc.

154-28 at TI-000207; Ds' 56.1 Stmt. ¶ 97; *see* note 1 above.)  Additionally, Plaintiff accused

Evans of disability discrimination because he kept asking Plaintiff to lift equipment even though

Plaintiff had sustained a back injury in 2017.  (Doc. 154-28 at TI-000207; Ds' 56.1 Stmt. ¶¶ 98,

120; *see* note 1 above.)

Head investigated all four allegations.  (Ds' 56.1 Stmt. ¶ 99; *see* note 1 above.)  First, she spoke to Sabol, who confirmed that he had had an argument with Plaintiff while on a Skype call in March.  (Ds' 56.1 Stmt. ¶ 100; *see* note 1 above.)  Sabol said that the argument was about technology and that Plaintiff hung up on him after Sabol raised his voice.  (*See* Doc. 154-28 at TI-000208.)  Regarding the "redneck" comment, Sabol described himself as such in reference to his love of the outdoors and fishing while he and Plaintiff were attempting to get to know each other better months later.  (*Id.* at TI-000208; Ds' 56.1 Stmt. ¶ 100; *see* note 1 above.)

Next, Head spoke to Ayres.  Ayres explained that two U.K.-based employees attended a 2019 Cisco conference in Spain because they had free tickets and that Plaintiff's request to attend a 2019 Cisco conference in California (for which free tickets were unavailable) was denied because it was too costly.  (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶¶ 102-105; *see* note 1 above.)  Regarding the Silver Peak training, Ayres told Head that Teneo had two free tickets and that he and Sabol were selected to attend because they could benefit from additional training on that product, whereas Plaintiff already had years of experience with Silver Peak and did not need the training.  (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶ 106; *see* note 1 above.)

Head also spoke to Evans, who told her that he had checked in with Plaintiff occasionally about the status of his back injury to see if he could lift equipment, and whenever Plaintiff said that he could not, Evans made other arrangements.  (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶ 108; *see* note 1 above.)

After her investigation, Head concluded that no discriminatory conduct had occurred. (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶ 110; *see* note 1 above.)  She did, however, conclude that Sabol should not have raised his voice during his March 29 call with Plaintiff and should think more carefully about describing himself as a "redneck," so she recommended that Sabol

attend workplace diversity training, which Sabol subsequently completed.  (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶¶ 111-112; *see* note 1 above.)

Having concluded that Plaintiff's allegations of discrimination were unfounded, Teneo decided to proceed with Plaintiff's termination.  (Ds' 56.1 Stmt. ¶ 113; *see* note 1 above.)  But on June 21 – the day after his phone call with Head – Plaintiff went on sick leave and did not return until June 26.  (Ds' 56.1 Stmt. ¶ 114; *see* note 1 above.)  During this time, Plaintiff sought treatment for his back for the first time since November 27, 2017.  (Doc. 154-2 at 183:4-7.)  He obtained a doctor's note dated June 21 stating that he could return to work on June 26, and also stating, "Activity is restricted as follows:  none."  (Doc. 154-34 at TI-00528.)

When he returned on June 26, Head and Evans spoke to Plaintiff over the phone; Head told Plaintiff the results of her investigation; and Evans terminated Plaintiff.  (Ds' 56.1 Stmt. ¶¶ 114-116; *see* note 1 above.)[16]  Head then sent Plaintiff an email attaching the results of her investigation along with an updated termination letter and settlement agreement.  (Doc. 154-31; Ds' 56.1 Stmt. ¶ 117; *see* note 1 above.)  As of December 2020, Plaintiff's solutions architect position had not been filled.  (Ds' 56.1 Stmt. ¶ 119; *see* note 1 above.)[17]

---

[16] Plaintiff asserts that Ayres was the decision maker regarding his termination even though Ayres had no personal knowledge of the reasons for the termination.  (P's Decl. ¶ 19.)  But the portion of Ayres's deposition that Plaintiff cites in support says only that Teneo's position statement to the EEOC stated that Ayres was part of the decision to terminate Plaintiff.  (*See id.*; Doc. 180-14 at 39.)

[17] Plaintiff alleges that his solutions architect position was "reverted . . . back" to a solutions engineer position and filled in September 2019 with a younger, non-Muslim, non-Pakistani individual.  (P's Decl. ¶ 52.)  While Head states in her affidavit that the solutions engineer position was filled by a "younger, non-Muslim, non-Pakistani person," she does not say anything about Teneo "revert[ing]" Plaintiff's solutions architect position to a solutions engineer position; instead, Head indicates that the solutions architect position remains a separate and (as of December 2020) unfilled position.  (Ds' 56.1 Stmt. ¶¶ 55 n.4, 119; Head Aff. ¶ 34-35.)

On July 1, 2019, Plaintiff filed a charge of discrimination with the EEOC. (Ds' 56.1
Stmt. ¶ 118; *see* note 1 above.)

### 5.    Plaintiff's Back Injury

On or about September 25, 2017, Plaintiff injured his back at work while installing
equipment, and he notified Evans and Head about his injury by email on October 2, 2017. (Doc.
154-32; Ds' 56.1 Stmt. ¶¶ 120-121; *see* note 1 above.) Shortly after his injury, Plaintiff traveled
at least once, to France, for work. (Doc. 180-21 at 188:2-9.)[18] Afterward, Plaintiff asked Evans
for "some accommodation" regarding travel. (*Id.* at 187:24-188:14.)

Plaintiff eventually obtained an MRI, (*see* Doc. 154-34 at TI-00534, TI-00538), and on
October 20, Head emailed Carey and Evans to let them know that she had spoken to Plaintiff
about his back and insurance coverage, noting that his "MRI scan results aren't looking good
apparently," (Doc. 154-33). Evans replied:

> On our call, he mentioned that his back is hurting, but he is passionate about his
> work so will keep working. He says not working won't make his back feel better.
> Earlier this week, he said the MRI shows 3 herniated discs. I encouraged him to
> be sure to take care of his back and do what is necessary. But he doesn't appear
> to be slowing down. Should we restrict him from traveling or take any other
> preventative actions?

(*Id.*) There is no evidence in the record that either Head or Carey responded to Evans's email.
And according to Plaintiff, he never received a response to his request for an accommodation,
(P's Decl. ¶ 99), and was "forced" to travel on numerous occasions, (P's Decl. ¶¶ 50-51, 92. 98).
Defendants state that Plaintiff was not required to travel after his back injury if he declined to do
so. (Evans Aff. ¶ 26.)

---

[18] Plaintiff also states that on October 10, he traveled to Poland for the same customer.
(SAC ¶ 23; P's 56.1 Resp. ¶ 19.) It is not clear from the record whether the trip to France and
the trip to Poland were part of the same trip or were different trips.

Plaintiff saw a doctor for his back injury on November 3 and again on November 27. (Doc. 154-34 at TI-00534 to 41; Ds' 56.1 Stmt. ¶ 123; *see* note 1 above.)  At his deposition, Plaintiff testified that he did not request or receive a doctor's note excusing him from any work responsibilities.  (Doc. 154-2 at 182:7-17, 185:23-186:2; Ds' 56.1 Stmt. ¶ 124; *see* note 1 above.) But during discovery, Plaintiff produced a document from the doctor he saw on November 3; it said that as of that date, Plaintiff's weight-lifting capabilities were limited to ten pounds and that Plaintiff was restricted from lifting from the floor, squatting, bending, or traveling until further notice because of his back injury.  (Doc. 163-12 at 7.)  Defendants dispute the authenticity and admissibility of this note.  (Ds' 56.1 Stmt. at 20 n.6.)[19]  In any case, it is undisputed that Plaintiff did not provide this or any other doctor's note to Teneo while he was employed there, (Doc. 154-2 at 157:18-158:3.)

On December 3, 2017, Teneo asked Plaintiff to perform a hardware installation, which Plaintiff completed.  (Doc. 180-18 at 64:2-11.)  Plaintiff did not tell Teneo that he could not perform the installation, he did not ask to be excused from the installation, and he was able to lift and move the equipment involved.  (Doc. 180-20 at 159:8-23.)  Plaintiff testified that this installation caused him pain, which he "managed."  (Doc. 180-21 at 184:15-17.)  This was the last time Plaintiff installed equipment for Teneo; afterward, whenever Teneo asked Plaintiff to perform an installation, Plaintiff declined and was not required to perform the installation.  (Doc. 154-2 at 162:25-163:17; *see* Doc. 163-9 at 30.)  After Plaintiff was promoted to solutions

---

[19] Defendants point out that this November 3 note was not part of the set of certified medical records they received from Plaintiff's medical provider.  (Ds' 56.1 Stmt. at 20 n.6; *see* Doc. 154-34.)  Rather, Plaintiff produced this note on October 20, 2020, after Plaintiff had been deposed and two weeks past the deposition deadline.  (Ds' 56.1 Stmt. at 20 n.6.)  A note from Plaintiff's doctor explained that the November 3 note had not been produced earlier because it was "misfiled in a separate folder."  (Doc. 163-12 at 12.)

architect in 2019, lifting and installing equipment was no longer one of his responsibilities. (Doc. 180-18 at 63:11-14, 64:12-16, 65:23-25.)

Plaintiff also traveled from December 12-14, 2017.  According to Defendants, Plaintiff was supposed to be attending a training course in Maryland that he had asked to attend.  (Ds' 56.1 Stmt. ¶ 146; Doc. 154-37; *see* note 1 above.)  According to Plaintiff, he traveled to Georgia and Florida.  (P's 56.1 Resp. at 28; Doc. 163-9 at 11-16).

In June 2018, at his request, Plaintiff attended a Cisco conference in Florida.  (Doc. 154-36; Ds' 56.1 Stmt. ¶¶ 144-145; *see* note 1 above.)  In February 2019, Plaintiff accepted an invitation from Ayres to travel to the United Kingdom for work, and Ayres approved an early arrival so that Plaintiff could visit his sister in England.  (Doc. 154-29 ("Ayres Aff.") ¶ 6; *see* Doc. 181-13 at 1.)[20]  In April 2019, Plaintiff traveled to Maryland to do a workshop for a customer.  (Doc. 181-13 at 4-6.)  Plaintiff also traveled to Illinois in April 2019.  (*Id.* at 7-8.)  In June 2019, Plaintiff traveled to attend another conference, the location of which is not apparent from the record.  (*See* Head Aff. ¶ 36; P's Mem. at 23.)[21]  Plaintiff testified that when he traveled, he experienced pain and issues with incontinence as a result of his back injury.  (Doc. 180-20 at 154:13-155:3; Doc. 180-21 at 192:3-24, 193:14-19.)

---

[20] Plaintiff disputes the purpose of the trip – Defendants assert that it was for a team meeting and Plaintiff asserts that it was for a workshop – but he does not dispute that he traveled to the United Kingdom in February 2019.  (*See* Ds' 56.1 Stmt. ¶¶ 148-150; P's 56.1 Resp. at 28.)  Plaintiff also contends that Ayres's affidavit "is not a signed valid Affidavit and should be ignored," (P's 56.1 Resp. at 1), but Ayres's affidavit is signed, under penalty of perjury, (Ayres Aff. at 2).

[21] Plaintiff also asserts that he was "suppose[d] to travel" to North Carolina and Virginia and in March and May 2019, respectively, (P's Decl. ¶ 50; Doc. 181-13 at 9, 11, 13), but it is not clear whether he did.

B.    **Procedural History**

Plaintiff brought this suit on February 28, 2020, asserting discrimination on the bases of

race, religion, national origin, and disability, as well as retaliation.  (Doc. 1.)  He originally

named only Teneo as a defendant.  (*Id.*)  Shortly afterward, Plaintiff filed an Amended

Complaint adding Carey as a defendant.  (Doc. 3.)  Teneo and Carey answered, (Doc. 10), and

the Court held an initial conference and entered a scheduling order, (Minute Entry dated May 14,

2020; Doc. 24).

On the deadline to file amended pleadings and join additional parties, Plaintiff sought

leave to file a Second Amended Complaint adding Head, Ayres, Evans, and Teneo USA, Inc. as

defendants.  (Doc. 26.)  That motion was opposed.  (Doc. 30.)  I then referred the case to

Magistrate Judge Paul E. Davison for scheduling, discovery, non-dispositive pretrial motions,

and settlement.  (Doc. 38.)  Judge Davison granted Plaintiff's motion to amend in part, allowing

Plaintiff to add Head, Ayres, Evans, and Teneo USA, Inc. as defendants, but denying the motion

to the extent it sought to add claims under Title VII of the Civil Rights Act of 1964 ("Title VII"),

the Age Discrimination in Employment Act of 1967 ("ADEA"), and the American with

Disabilities Act of 1990 ("ADA") against individual defendants.  (*See* Doc. 90.)

After extensive discovery litigation, Defendants filed a pre-motion letter in anticipation

of a motion for summary judgment.  (Doc. 142.)  The Court held a pre-motion conference,

(Minute Entry dated Nov. 24, 2020), and the instant cross-motions followed, (Docs. 151, 163).

Among his supporting papers, Plaintiff filed a 149-page declaration.  (*See* Doc. 168.)  I

ordered Plaintiff to resubmit this document in accordance with the thirty-page limit I had set at

the pre-motion conference, and I allowed Plaintiff to resubmit his other supporting papers.  (Doc.

169.)  Because of the confusing state of the docket – Plaintiff filed his supporting exhibits in

several stages using an unconventional numbering system – I also ordered the parties to submit tabbed binders of their exhibits to my chambers.  (Doc. 187.)  Indexes cross-referencing Plaintiff's exhibits with their corresponding docket numbers can be found in docket entries 188-1 and 191-1.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The same standard applies to cross-motions for summary judgment.  *See Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001); *C & A Carbone, Inc. v. County of Rockland*, No. 08-CV-6459, 2014 WL 1202699, at \*5 (S.D.N.Y. Mar. 24, 2014).  Generally, in deciding cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Morales*, 249 F.3d at 121; *see Chartis Seguros Mex., S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014).  But where, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together.  *Royal & Sun All. Ins., PLC v. E.C.M. Transp., Inc.*, No. 14-CV-3770, 2015 WL 5098119, at \*2 (S.D.N.Y. Aug. 31, 2015); *Chartis Seguros*, 3 F. Supp. 3d at 179.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

Documents are admissible only if they are authenticated by extrinsic evidence or self-authenticating. *E.g.*, *Sys. Agency v. Villanueva*, No. 19-CV-6486, 2020 WL 7629879, at *1 (S.D.N.Y. Dec. 22, 2020).  Accordingly, "documents that are not attached to an affidavit made on personal knowledge setting forth facts that would be admissible in evidence and sufficient to authenticate the document cannot be considered on summary judgment." *Id.* (cleaned up).  "If the party moving for summary judgment 'fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied.'" *Id.* (quoting *Giannullo v. City of N.Y.*, 322 F.3d 139, 140-41 (2d Cir. 2003)).  But "[m]aterial relied upon at summary judgment need not be admissible in the form presented on the motion; as long as the evidence will be presented in admissible form at trial, it may be considered on summary judgment." *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15-CV-8459, 2018 WL 3364388, at *2 (S.D.N.Y. July 9, 2018) (cleaned up).  The proponent of the evidence "must show that the evidence could be rendered in an admissible form at trial." *Metro. Enter. Corp. v. United Techs. Int'l Corp.*, No. 03-CV-1685, 2005 WL 2300382, at *6 (D. Conn. Sept. 21, 2005).

*Pro se* litigants must be afforded "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014).  But *pro se* plaintiffs are not exempt from the "rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (cleaned up).

## III.  <u>DISCUSSION</u>

Liberally construed, Plaintiff's Second Amended Complaint alleges (1) wrongful termination, (2) retaliation, (3) failure to promote, (4) disparate treatment, and (5) a hostile work

environment, based on (a) race, (b) religion, (c) national origin, (d) age, and (e) disability, in

violation of (i) Title VII, (ii) the ADEA, (iii) the ADA, and (iv) the New York State Human

Rights Law ("NYSHRL").[22]  (*See* SAC at 31-43; Doc. 90 at 2.)  It also asserts a failure-to-

accommodate claim under the ADA.  (*See* SAC at 5-6; Doc. 90 at 2.)  Both sides argue that they

are entitled to summary judgment on all claims.[23]

All of Plaintiff's discrimination claims are analyzed under the familiar burden-shifting

framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973).  *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir.

2016); *McMillan v. City of N.Y.*, 711 F.3d 120, 125 (2d Cir. 2013); *Munoz-Nagel v. Guess, Inc.*,

No. 12-CV-1312, 2013 WL 1809772, at *4 n.5 (S.D.N.Y. Apr. 30, 2013).[24]

> Under that framework, a plaintiff must first establish a *prima facie* case of
> discrimination, which causes the burden of production to shift to the defendant to
> offer a legitimate, nondiscriminatory rationale for its actions.  If the defendant
> satisfies its burden of production, then the presumption raised by the *prima facie*
> case is rebutted and drops from the case, such that at the final stage, the plaintiff
> then has the opportunity to demonstrate that the proffered reason was not the true
> reason for the employment decision.

---

[22] Plaintiff's Second Amended Complaint cites the New York City Human Rights Law
("NYCHRL"), (SAC at 43), but Plaintiff apparently intended to bring his claims under the
NYSHRL instead, (Doc. 119 ¶ 2, *see* P's Mem. at 1), and he has explicitly stated that he is not
asserting any claims under the NYCHRL, (*id.* at 20 & n.1; P's 56.1 Resp. at 3).

[23] Plaintiff titles his motion "Plaintiff's Cross-Motion for Partial Summary Judgment,"
but the Court is unable to decipher which claim(s), if any, Plaintiff is not moving on.  (Doc. 161.)
Plaintiff's Memorandum of Law in support of his motion presents arguments in support of
summary judgment on each claim.  (Doc. 171 at 1-17.)  Accordingly, the Court treats Plaintiff's
motion as one for summary judgment on all counts in the Second Amended Complaint.

[24] Because "discrimination claims brought pursuant to the NYSHRL are governed by the
same standards as govern ADA, ADEA, and Title VII claims," *Kantrowitz v. Uniondale Union
Free Sch. Dist.*, 822 F. Supp. 2d 196, 215 n.13 (E.D.N.Y. 2011), I analyze Plaintiff's NYSHRL
claims together with their federal counterparts.

*Kovaco*, 834 F.3d at 136 (cleaned up).  In demonstrating that the employer's proffered reason was not the true reason for the employment decision, a plaintiff "must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (cleaned up).  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  *Id.*

### A.    <u>Wrongful Termination</u>

To establish a *prima facie* case for wrongful termination, a plaintiff must allege that "(1) he falls within a protected group; (2) he held a position for which he was qualified; (3) he was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of discrimination."  *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 229 (2d Cir. 2014) (cleaned up). "Conclusory and speculative allegations will not suffice to demonstrate discriminatory intent. Rather, Plaintiff must point to facts that suggest that the adverse action was motivated, at least in part,[25] by discriminatory animus."  *Henny v. N.Y. State, Off. of Mental Health*, 842 F. Supp. 2d 530, 553 (S.D.N.Y. 2012) (cleaned up); *see Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.").  For purposes of the *prima facie* case,

> an inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's

---

[25] A plaintiff has a heavier burden under the ADA, which "requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action."  *Natofsky v. City of N.Y.*, 921 F.3d 337, 348 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2668 (2020).

> protected group; or the more favorable treatment of employees not in the
> protected group; or the sequence of events leading to the plaintiff's discharge. . . .
> [A]n inference of discrimination also arises when an employer replaces a
> terminated or demoted employee with an individual outside the employee's
> protected class.

*Littlejohn v. City of N.Y.*, 795 F.3d 297, 312-13 (2d Cir. 2015) (cleaned up).

Plaintiff has failed make even a minimal showing of circumstances that could give rise to

an inference of discrimination based on membership in a protected class.  Up until June 18, 2019

– when Plaintiff, seeing the writing on the wall, belatedly complained about an argument with

Sabol from March 2019 – none of the events leading to Plaintiff's termination had anything to do

with Plaintiff's race, religion, national origin, age, or disability.  For example, the numerous

complaints about Plaintiff's behavior were unrelated to any protected class, there is no evidence

that behavior similar to Plaintiff's was tolerated for employees outside of Plaintiff's protected

classes, and Plaintiff's former position at Teneo had not, as of December 2020, been filled by an

employee outside of Plaintiff's protected classes.

Indeed, any such inference of discrimination is particularly unjustified in this case, where

several of the same people who interviewed and hired Plaintiff less than three years earlier –

Evans, Head, and Carey – decided to terminate his employment.  *See Jetter v. Knothe Corp.*, 324

F.3d 73, 76 (2d Cir. 2003); *Young v. Daughters of Jacob Nursing Home*, No. 09-CV-7475, 2011

WL 2714208, at *6 (S.D.N.Y. July 12, 2011), *aff'd*, 491 F. App'x 263 (2d Cir. 2012) (summary

order).  "[W]hen the person who made the decision to fire was the same person who made the

decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent

with the decision to hire."  *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997).

Plaintiff argues that Gibson hired him, (P's Mem. at 20; *see* note 2 above), and notes that Ayres

was involved in the decision to fire him, (*see* note 16 above), but this would not undermine the

same-actor inference.  "The decision-makers in the hiring and firing need not mirror each other

exactly as long as one management-level employee played a substantial role in both decisions,"
*Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 250 (S.D.N.Y. 2000), and it is undisputed that
Evans and Head interviewed Plaintiff and recommended that Carey hire him, (*see* note 2 and
accompanying text above), and concluded that he should be fired, (*see* notes 12-16 and
accompanying text above).[26]

The only protected characteristic that changed in the short time between Plaintiff's hiring
and firing was his back injury, but there is no evidence from which a reasonable jury could infer
that his injury was connected to his termination.  Plaintiff was terminated a year and a half after
the last time he installed equipment, (*see* Doc. 154-2 at 162:25-163:17; Doc. 163-9 at 30), and he
was no longer required to lift or install equipment once he became a solutions architect, (Doc.
180-18 at 63:11-14, 64:12-16, 65:23-25), so there is no reason to believe, or evidence, that any
alleged lifting restrictions factored into his termination.  Further, there is nothing to suggest that
any alleged travel restrictions motivated Plaintiff's termination, as he traveled throughout his

---

[26] Defendants argue that Teneo's diverse workforce also undermines an inference of
discrimination.  (Ds' Mem. at 6.)  According to Carey, Teneo employed approximately thirty-
three people when Plaintiff was terminated, nine of whom were African American or Asian and
fourteen of whom were over fifty years old.  (Carey Aff. ¶ 5.)  Plaintiff disputes this and asserts
that Teneo had 184 employees when Plaintiff was terminated and that only 3 were over the age
of fifty, that fewer than one percent were Muslim, and that most were white, younger than he,
and non-Pakistani.  (P's 56.1 Resp. at 2; *id.* ¶ 1.)  (Confusingly, though, Plaintiff asserts in one
instance that Teneo had 186 employees when he was terminated, (*id.* ¶ 1), and in others, he
asserts that Teneo had 108 employees and that two percent were Muslim, (*e.g.*, P's Decl. ¶ 13).)
Although Defendants provide a plausible explanation as to why their figures are correct and
Plaintiff's are not, (*see* Ds' Opp. at 8-9), neither side cites admissible evidence other than their
own say-so regarding Teneo's employment demographics, so this issue, were it material, would
need to be decided by a jury.  *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.
133, 151 (2000) (on motion for summary judgment, district court "must disregard all evidence
favorable to the moving party that the jury is not required to believe"); *Davis-Garett v. Urban
Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (same); *Williams v. City of White Plains*, 718 F.
Supp. 2d 374, 377 (S.D.N.Y. 2010) (evidence that court should disregard on summary judgment
"includes testimony and affidavits from interested witnesses").

employment for Teneo, including in June 2019 – the month he was terminated.  (Head Aff. ¶ 36; P's Mem. at 23.)

Even if Plaintiff were able to meet his burden of establishing a *prima facie* case for wrongful termination, Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination – namely, his documented behavioral problems that began shortly after his hiring and continued up until his termination.  Employee insubordination and other conduct that is disruptive to the workplace are legitimate, nondiscriminatory reasons for terminating an employee.  *Tebbenhoff v. Elec. Data Sys. Corp.*, 244 F. App'x 382, 384 (2d Cir. 2007) (summary order); *McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 409 (E.D.N.Y. 2010); *see Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000).  Here, Evans, Head, and Carey received numerous complaints about Plaintiff during his relatively short tenure at Teneo:  that he bullied co-workers and Teneo partners, (*see* Doc. 154-12 at TI-00340; Doc. 154-16 at TI-00558), refused to participate in meetings, (*see* Doc. 154-11 at TI-000166), disparaged Teneo and upset Teneo partners, (*see* Doc. 154-22 at TI-000197; Doc. 154-18 at TI-00635), and was disrespectful to his supervisors, (*see* Doc. 154-19).  His colleagues began to ask to not work with him because in their view he had a bad attitude, was toxic and demoralizing, treated Teneo's clients as his own, and said that he was interviewing for other jobs, (*see* Doc. 154-22 at TI-000194 to 97).  And when confronted, Plaintiff defended his behavior and asserted that it was not inappropriate.  (*See id.* at TI-000193).  All of these are legitimate, nondiscriminatory reasons for Plaintiff's termination.

Because Defendants have met their burden to offer a legitimate, non-discriminatory reason for terminating Plaintiff, the burden shifts to Plaintiff to produce evidence that Defendants' reason is pretextual.  *E.g.*, *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.

2006).  Plaintiff argues that pretext is shown because Teneo has articulated "shifting" reasons for

his termination.  (*See* P's Mem. at 10-13.)  He says he was told on June 26, 2019 that he was

being terminated for making damaging statements about Teneo's partners, but that Teneo is now

asserting that Plaintiff was terminated for performance issues, "working as a [b]usiness,"

applying for a job at a competitor, trying to leave Teneo, client issues, and partner issues.  (P's

Mem. at 10-12, 20-21.)  First, Teneo has not asserted that Plaintiff was terminated for

performance issues.  To the contrary, Evans had remarked that "it would be a shame to lose

someone with such strong technical capabilities."  (Doc. 154-16 at TI-00559.)  Consequently,

Plaintiff's citations to his positive performance reviews are unavailing.  (*See* P's Mem. at 8; P's

Decl. ¶ 58-61.)  Either way, "courts have typically found evidence such as positive performance

reviews, bonuses, and salary increases sufficient to establish pretext only when paired with other

evidence demonstrating a discriminatory motive."  *Forte v. Liquidnet Holdings, Inc.*, No. 14-CV-

2185, 2015 WL 5820976, at *11 (S.D.N.Y. Sept. 30, 2015), *aff'd*, 675 F. App'x 21 (2d Cir.

2017) (summary order).

Second, although "[i]nconsistent explanations for a challenged employment action can be

evidence of pretext," *Zimmitti v. Aetna Life Ins. Co.*, 64 F. Supp. 2d 69, 81 n.24 (D. Conn. 1999),

Teneo's explanations have not "'shifted' in a way that would demonstrate pretext," *Fahrenkrug*

*v. Verizon Servs. Corp.*, No. 11-CV-1014, 2015 WL 13021890, at *17 (N.D.N.Y. May 14, 2015),

*aff'd*, 652 F. App'x 54 (2d Cir. 2016) (summary order).  Teneo may have identified multiple

reasons for Plaintiff's termination, but not shifting ones.  *See id.* ("The individual examples of

poor job performance that [Defendant] provided to Plaintiff are not shifting, contradictory

explanations for [the termination] decision, but rather a sampling of the factors that led to

[Defendant's] decision that Plaintiff needed [to be terminated].").  All of the examples provided

by Teneo relate to inappropriate comments by Plaintiff that disturbed his colleagues.  Teneo still

maintains that Plaintiff was terminated for making damaging statements about its partners, (*e.g.*,

Ds' Mem. at 7-8), among other things, and none of the reasons that Teneo has proffered for

Plaintiffs' termination are inconsistent with each other.  "Although [Defendant] might have

given Plaintiff multiple examples of [its] concerns with [his] work, [its] overall explanation for

[terminating him] never changed."  *Fahrenkrug*, 2015 WL 13021890, at *17.

Plaintiff also denies that he engaged in the conduct that resulted in his termination.  (P's

Mem. at 18-19.)  But it does not matter whether Plaintiff actually engaged in the conduct; what

matters is whether Defendants had a good-faith basis for believing that he had when they

terminated him.  *See Widomski v. State Univ. of N.Y. (SUNY) at Orange*, 933 F. Supp. 2d 534,

550 (S.D.N.Y. 2013), *aff'd*, 748 F.3d 471 (2d Cir. 2014).  "In a discrimination case . . . [courts]

are decidedly not interested in the truth of the allegations against plaintiff."  *McPherson v. N.Y.C.

Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006).  Rather, courts are "interested in what

*motivated* the employer; the factual validity of the underlying imputation against the employee is

not at issue."  *Id.* (emphasis in original) (cleaned up); *see Eisner v. Cardozo*, 684 F. App'x 29, 31

(2d Cir. 2017) (summary order).  Plaintiff has made no showing that the complaints to Evans,

Head, and Carey were known to be false or otherwise generated to mask illegal discrimination.

*See McPherson*, 457 F.3d at 216 n.7; *see also Dister v. Cont'l Grp., Inc.*, 859 F.2d 1108, 1116

(2d Cir. 1988) (explaining that because "[e]vidence that [defendant] made a poor business

judgment in [its adverse employment decision] generally is insufficient to establish a genuine

issue of fact as to the credibility of the [defendant's] reasons . . . [,] the reasons tendered need not

be well-advised, but merely truthful"); *Duckett v. Wal-Mart Stores, Inc.*, No. 07-CV-6204, 2009

WL 995614, at *11-12 (W.D.N.Y. Apr. 14, 2009) (noting that "when analyzing a pretext claim

the inquiry is whether the employer's stated reason is the actual reason for the challenged action and not whether the employer's stated reason for its decision is ill-advised, mistaken, or unreasonable," and granting summary judgment where defendant claimed that it terminated plaintiff due to her unauthorized use of a discount, a claim plaintiff disputed).

Plaintiff may dispute whether he behaved inappropriately, but his evidence does not raise a question as to whether Evans, Head, and Carey *thought* he had. "In short, although [Plaintiff] may consider [Defendants'] termination decision an over-reaction to [his] perceived mishaps, [he] can point to no evidence in the record indicating that [his] employer was not, in fact, displeased with [his] actions, much less that the real reason for [his] termination was . . . discrimination." *Soderberg v. Gunther Int'l, Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005) (summary order); *see Henkin v. Forest Labs., Inc.*, No. 01-CV-4255, 2003 WL 749236, at *6 (S.D.N.Y. Mar. 5, 2003) ("[A]n employee's disagreement with her employer's perception of her work does not satisfy her burden of showing that the employer's proffered reason for termination was a pretext for discrimination."), *aff'd*, 88 F. App'x 478 (2d Cir. 2004) (summary order).

To support his age discrimination claim, Plaintiff cites to a LinkedIn conversation he had with a former Teneo employee who stated, "I believe age discrimination played a part in me being let go by the new sales management." (Doc. 163-28 at 25.) This conversation is inadmissible hearsay. But even if I were to consider it, this employee's conclusory assertion about his situation – like Plaintiff's own conclusory assertions – would not be enough to avoid summary judgment. *See Schwapp*, 118 F.3d at 110.

Overall, Plaintiff's evidence is insufficient to support a rational finding that Defendants' proffered reasons were false and that more likely than not discrimination was the real reason for the employment action. *See Weinstock*, 224 F.3d at 42. Plaintiff has not presented any

30

statements reflective of bias against those in a protected class or pointed to conduct that would reasonably lead a jury to conclude that Defendants more likely than not harbored a discriminatory motive when firing Plaintiff.  *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 744 (2d Cir. 2014) (summary order).

While direct evidence of discriminatory intent is not required, and "credible evidence that a defendant's explanation is false along with a strong *prima facie* case may support an inference that the adverse action was motivated by discrimination," *Widomski*, 933 F. Supp. 2d at 551, here, there is neither a strong *prima facie* case, nor credible evidence that the employer's explanation was not held in good faith.  "Plaintiff's subjective belief that he was not treated fairly is simply not enough to demonstrate pretext."  *Silva v. Peninsula Hotel*, 509 F. Supp. 2d 364, 386 (S.D.N.Y. 2007).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's wrongful termination claims.

## B.    <u>Retaliation</u>

Plaintiff alleges that Teneo terminated his employment in retaliation for complaining about discrimination.  (P's Mem. at 1.)  To establish a *prima facie* case of retaliation, an employee must show that (1) the employee "was engaged in protected activity, (2) the employer was aware of that activity, (3) the employee suffered a materially adverse action, and (4) there was a causal connection between the protected activity and that adverse action."  *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 104 (2d Cir. 2020) (cleaned up).

Here, Plaintiff cannot show a causal connection between his protected complaints and his termination because the decision to terminate his employment preceded his complaints.  *See Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y.

2013) ("It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."), *aff'd*, 641 F. App'x 60 (2d Cir. 2016) (summary order).  By June 14, 2019, Evans had already decided that once the complaints about Plaintiff were validated, Teneo "need[ed] to let him go, or encourage him to take a position elsewhere if that is what [Teneo] prefer[red]."  (Doc. 154-22 at TI-000195.)  By June 17, Head had checked Teneo's "legal obligations relating to [Plaintiff] in New York state and drafted a termination letter and settlement agreement" to be presented to Plaintiff unless "his side of the story" suggested otherwise (which it did not end up doing).  (*Id.* at TI-000194.)  It was not until the next day, June 18, after Head had already arranged with Evans to terminate Plaintiff in a call that night, (*id.* at TI-000193 to 94; Doc. 154-26 at TI-00497), that Plaintiff made his first complaint alleging discrimination.[27]  Acting on legal advice, Teneo decided to delay Plaintiff's termination to conduct an investigation into his allegations, but this only postponed the inevitable.  Because Teneo had decided to terminate Plaintiff's

---

[27] Plaintiff alleges that he complained to Scott Gibson on October 14, 2016 that Evans was "toxic and raci[]st," (P's Decl.¶ 9), but he does not allege that he suffered any retaliation as a result, (*see* SAC ¶¶ 108, 112 (identifying protected activity as June 18, 2019 reference to EEOC and adverse action as June 26, 2019 termination); P's Mem. at 1-2 (describing termination as adverse action and alleging it was retaliation for June 2019 complaint of discrimination)).  Nor could he.  There is no evidence that Gibson was involved in the termination or that any individual who was involved in the termination was aware of the alleged complaint to Gibson, *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002) ("Defendants must have knowledge of the protected activity to be able to engage in retaliation.") (cleaned up), and it was too far removed in time for an inference of retaliation to arise from temporal proximity, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.") (cleaned up); *Frisenda v. Incorporated Village of Malverne*, 775 F. Supp. 2d 486, 512 (E.D.N.Y. 2011) ("[C]ourts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.").

employment before he complained of allegedly discriminatory conduct, no reasonable jury could conclude that the decision was motivated by a desire to retaliate against him for that complaint. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 71 n.8 (2d Cir. 2015); *see also Stephan v. W. Irondequoit Cent. Sch. Dist.*, 450 F. App'x 77, 80 (2d Cir. 2011) (summary order) (no causal connection where defendant made decision to terminate plaintiff before she filed any complaint).

Even if Plaintiff were able to establish a *prima facie* case of retaliation, as discussed above, Defendants have articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, and consequently "the burden shifts back to [the plaintiff] to establish, through either direct or circumstantial evidence, that [the employer's] action was, in fact, motivated by discriminatory retaliation." *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (cleaned up). A plaintiff may do so in two ways: "either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions." *Id.* (cleaned up). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered . . . reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013). For example, "evidence of disparate treatment of similarly situated individuals allows for the conclusion that the reasons advanced by an employer . . . are pretextual." *Summa*, 708 F.3d at 130. "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage. However, a plaintiff may rely on evidence comprising her *prima facie* case, including temporal proximity, together with other

evidence such as inconsistent employer explanations, to defeat summary judgment at that stage."
*Kwan*, 737 F.3d at 847.

Plaintiff argues that Teneo's reasons for his termination are pretextual, as evidenced by
the fact that he was not previously warned about or reprimanded for the alleged misconduct.
(P's Mem. at 2-3.)  But this is belied by the record, which contains several documented
discussions with Plaintiff about his behavioral issues.  (*See* Doc. 154-14 at TI-00467; Doc. 154-
16 at TI-00558; Doc. 154-18 at TI-00636; Doc. 154-19.)  He also submits affidavits from former
colleagues (at Teneo and elsewhere) attesting that, in their experience, Plaintiff was courteous
and respectful.  (*See* P's 56.1 Resp. ¶¶ 32-33; P's Decl. ¶ 19B.)  Not only do these affidavits cast
no light on the experiences of others or the specific incidents at issue, but they do not change the
fact that Evans received complaints about Plaintiff's behavior issues (and observed some of them
firsthand).  Further, as Defendants note, these affidavits are not from people who worked with
Plaintiff around the time he was terminated.  (Ds' Opp. at 6-7 & n.4.)

Plaintiff also argues that it is unbelievable that an employer would tolerate a deficient
employee for three years, and that his termination can therefore only be explained by his
protected activity.  (P's Mem. at 2.)  But Defendants do not argue that Plaintiff was a deficient
employee; in fact, the record shows that Teneo was willing to work with him on his behavioral
issues because of his "strong technical capabilities."  (Doc. 154-16 at TI-00559.)  The fact that
Plaintiff's behavior reached a breaking point after less than three years of employment and not
sooner is not evidence that the reason for his termination is pretextual.

Ultimately, Plaintiff is left with the close temporal proximity between his complaint and
his termination as the only fact even suggesting retaliatory animus.  Without more, though, "such
temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence

of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (*per curiam*);

*accord Ya-Chen Chen*, 805 F.3d at 72 (noting that the Second Circuit has "long held that

temporal proximity between a protected complaint and an adverse employment action is

insufficient to satisfy plaintiff's burden to bring forward some evidence of pretext") (cleaned up).

As Plaintiff has not produced any evidence of pretext, the mere fact that he was terminated

shortly after making his complaints to Head is insufficient to raise a genuine issue of material

fact as to whether a desire to retaliate motivated his termination.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation

claims.

**C.**   **Failure to Promote**

Plaintiff argues that he was denied a promotion to global SD-WAN practice director

because of his age, race, national origin, religion, and disability when Ayres was appointed to the

position instead of Plaintiff.  (P's Mem. at 14, 16.)[28]  To establish a *prima facie* case for failure

to promote, a plaintiff must demonstrate that (1) he "was within the protected class"; (2) he "was

qualified for the position"; (3) he "was subject to an adverse employment action"; and (4) "the

adverse action occurred under circumstances giving rise to an inference of discrimination."

---

[28] Why Plaintiff would want this U.K.-based global role, when he was not willing to work globally, (Doc. 180-13 at 29:11-16), and threatened to resign over the issue when he was forced to work on non-U.S. projects, (Doc. 180-9 at 84:4-85:2), is beyond the Court's understanding. Indeed, as discussed further below, Plaintiff argues that Evans and Ayres subjected him to a hostile work environment by asking him to work on non-U.S. projects.  Regardless, on summary judgment, a court may not construe one claim as an admission in connection with an inconsistent claim.  *See Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95-96 (2d Cir. 1994); *see also Polanco v. City of N.Y.*, No. 14-CV-7986, 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 28, 2018) ("It is well settled that the alternative pleading principles of Rule 8(d) apply even at the summary judgment stage of litigation.") (collecting cases).

*Naumovski v. Norris*, 934 F.3d 200, 214 n.39 (2d Cir. 2019) (cleaned up); *see Coger v. Conn. Dep't of Pub. Safety*, 143 F. App'x 372, 374 (2d Cir. 2005) (summary order).

"The burden of establishing a *prima facie* case is not onerous, and has been frequently described as minimal," *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (cleaned up), and thus there are circumstances in which a court will presume a plaintiff has established a *prima facie* case and proceed directly to the second or third step of *McDonnell Douglas*, *see id.* at 75-76 ("In part because [plaintiff's] burden at the *prima facie* stage is minimal, and because [plaintiff] does not argue that [defendant] failed to proffer a legitimate, nondiscriminatory explanation for its adverse employment action, . . . [w]e thus proceed directly to the third step of the *McDonnell Douglas* analysis . . . ."); *Terpstra v. Shoprite Supermarket, Inc.*, No. 17-CV-6840, 2019 WL 3338267, at *5 (S.D.N.Y. July 25, 2019) (collecting cases), *appeal dismissed*, No. 19-2570 (2d Cir. Dec. 2, 2019). "This is because a plaintiff who can prevail at the third stage of the *McDonnell Douglas* process has necessarily demonstrated circumstances giving rise to an inference of discrimination, and a plaintiff who cannot prevail at the third stage cannot prevail on his/her claim whether or not there exist circumstances giving rise to an inference of discrimination." *Johnson v. Ultravolt, Inc.*, No. 13-CV-3518, 2015 WL 541519, at *4 (E.D.N.Y. Feb. 10, 2015). Accordingly, to "avoid redundancy" between the first and third stages of the *McDonnell Douglas* test, *id.* at *4, the Court will assume for this claim that plaintiff has established a *prima facie* case and move directly to the second and third stages of the *McDonnell Douglas* analysis.[29]

---

[29] Defendants assert that Plaintiff cannot establish a *prima facie* case because the global SD-WAN practice director position was never advertised or open for applications, no one other than Ayres was considered for the position, and Plaintiff never applied for the position and was therefore never rejected. (Ds' Mem. at 15.) For support, however, they rely solely on Carey's

Defendants have proffered a legitimate, nondiscriminatory reason for appointing Ayres to the role of global SD-WAN practice director:  Ayres was more qualified for the role because he was already serving in a management position, whereas Plaintiff had no management experience at Teneo.  (Ds' Mem. at 15.)  In fact, it is undisputed that Ayres had been managing employees at Teneo since 2013, whereas Plaintiff was not responsible for managing any Teneo employees. (P's 56.1 Resp. ¶ 6; Ds' 56.1 Stmt. ¶ 47; *see* note 1 above.)

Accordingly, the burden shifts to Plaintiff to prove that this was not Teneo's true reason for appointing Ayres to the position but rather is a pretext for unlawful discrimination.  *See Reeves*, 530 U.S. at 143; *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001), *as amended* (June 6, 2001). Plaintiff asserts that Ayres was less qualified for the position, (P's Mem. at 14), and that Plaintiff had "deeper skills than Ayres," (P's Decl. ¶ 93 (citing Doc. 180-15 at 19:13-23, in which a former colleague testified, "[Ayres] seemed pretty competent, . . . and I can't judge, . . . between [Ayres and Plaintiff], . . . who had more skills.  [Ayres] may have had broader skills.  [Plaintiff] may have had deeper skills in certain things . . . .")).  But a plaintiff can establish pretext based on qualifications evidence only where the plaintiff's qualifications were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Szewczyk v. Saakian*, 774 F. App'x 37, 40 (2d Cir. 2019) (summary order) (cleaned up); *see Abraham v. N.Y.C. Dep't of Educ.*, 398 F. App'x 633, 635 (2d Cir. 2010) (summary order) (same); *see also Timothy v. Our Lady of Mercy Med. Ctr.*, 233 F. App'x 17, 21 (2d Cir.

---

affidavit, which a jury is not required to believe over Plaintiff's testimony that he applied for the position in a conversation with Carey.  *See, e.g.*, *Reeves*, 530 U.S. at 151; *Davis-Garett*, 921 F.3d at 46; *Williams*, 718 F. Supp. 2d at 377.

2007) (summary order) ("[A]bsent a striking disparity in such credentials, one should be very hesitant to draw any inference from a battle of credentials.").  The relevant inquiry is not simply who had the most experience.  *See Patel v. City of N.Y.*, 699 F. App'x 67, 69 (2d Cir. 2017) (summary order) ("We have held . . . that greater experience cannot alone establish that a candidate's qualifications are so superior to another's that the employer's hiring decision may be found to have been discriminatory.").  If it were, ADEA plaintiffs would almost automatically succeed in establishing pretext because they have had more time to work and advance than their younger counterparts.  "Only where an employer's business decision is so implausible as to call into question its genuineness should th[e] Court conclude that a reasonable trier of fact could find that it is pretextual."  *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010) (summary order).

Plaintiff has not shown that his qualifications were so superior to Ayres's that no reasonable person could have selected Ayres for the global SD-WAN practice director over Plaintiff.  Viewing the evidence in the light most favorable to Plaintiff, he has established – at most – that he had more SD-WAN experience than Ayres.  But it is undisputed that the global SD-WAN practice director position was a management position, and Ayres had management experience at Teneo, whereas Plaintiff did not.  The Court does "not sit as a super-personnel department that reexamines an entity's business decisions."  *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (*per curiam*) (cleaned up).  Plaintiff's subjective "disagreement with the way [Defendants] weighed his and [the other applicants'] qualifications does not create an issue of material fact.  An employer has the right to decide how it will value the various qualifications different candidates bring to the table."  *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 582 (S.D.N.Y. 2008) (citation omitted).

Overall, "the plaintiff's conclusory allegations of discrimination and [his] own subjective evaluations that [he] was better qualified than [his] coworkers are insufficient to demonstrate discrimination." *Richetts v. Ashcroft*, No. 00-CV-1557, 2003 WL 1212618, at *7 (S.D.N.Y. Mar. 17, 2003). Accordingly, Defendants are entitled to summary judgment on Plaintiff's failure-to-promote claims.

### D.   **Disparate Treatment**

Plaintiff cites four instances in which he was allegedly treated differently because of one or more of his protected traits: not being selected for the CEO Club in 2018, (P's Mem. at 4-5), not being allowed to attend a 2019 Cisco conference, (*id.* at 9), not being chosen to attend a 2019 Silver Peak training, (*id.* at 6-8), and the change in his appointment from solutions engineer to solutions architect, (P's Decl. ¶ 35). To establish a *prima facie* case of disparate treatment, Plaintiff must show that he was (1) a member of a protected class, (2) qualified for the position, and (3) subjected to an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002).

In the context of a disparate-treatment claim, an adverse employment action is one that constitutes "a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (cleaned up). "Such action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 211 (E.D.N.Y. 2014) (quoting *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012)). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material

responsibilities, or other indices unique to a particular situation." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (cleaned up).  But "a 'bruised ego,' a 'demotion without change in pay, benefits, duties, or prestige,' or 'reassignment to [a] more inconvenient job' are all insufficient to constitute a tangible or materially adverse employment action." *Hayle v. Nassau Health Care Corp.*, No. 08-CV-2396, 2013 WL 6231164, at *5 (E.D.N.Y. Dec. 2, 2013) (alteration in original) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Mere inconveniences like these do not constitute adverse employment actions unless they are accompanied by "some attendant negative result, such as a deprivation of a position or opportunity." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 354-55 (S.D.N.Y. 2006) (cleaned up).

The Court agrees with Defendants that none of the incidents of alleged disparate treatment affected the terms or conditions of Plaintiff's employment.  (*See* Ds' Mem. at 11; Ds' Opp. at 10.)  Regarding the CEO Club, "the failure to receive recognition and merit awards," such as the trip to Iceland offered in 2018, "is insufficient to adversely [affect] the terms and conditions of [plaintiff's] employment." *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 149 (E.D.N.Y. 2002).

Regarding the Cisco and Silver Peak trainings in 2019, "[t]he denial of professional training opportunities may constitute an adverse employment action, but only where an employee can show material harm from the denial, such as a failure to promote or a loss of career advancement opportunities." *Zoulas v. N.Y.C. Dep't of Educ.*, 400 F. Supp. 3d 25, 55 (S.D.N.Y. 2019) (cleaned up).  Plaintiff has not introduced any evidence that missing these trainings resulted in material harm, and he has therefore failed to establish that either of these incidents were adverse employment actions. *See Sekyere v. City of N.Y.*, No. 05-CV-7192, 2009

40

WL 773311, at *4 (S.D.N.Y. Mar. 18, 2009) ("Plaintiff does not contend that her position was altered in any way by not receiving some specific training, nor does she contend that she was disciplined, demoted, transferred, or terminated for lack of some fundamental knowledge that should have been provided for her through training.  Accordingly, any failure by Defendants to provide Plaintiff with training does not rise to the level of an adverse employment action.").

Regarding Plaintiff's change in appointment from solutions engineer to solutions architect, Plaintiff testified that this move was a promotion.  (*See* Doc. 154-2 at 58:6-10, 60:12-20.)  Even accepting for the sake of argument Plaintiff's unsupported assertion that it was a lateral move, (*see* P's Mem. at 20; P's Decl. ¶ 13), according to Plaintiff's own allegations his monthly income went up in this position, (*see* P's Decl. ¶¶ 59-60), which suggests that it was not an adverse employment action, *cf. Patrolmen's Benevolent Ass'n of City of N.Y. v. City of N.Y.*, 310 F.3d 43, 51 (2d Cir. 2002) (a transfer may amount to an adverse employment action where it is accompanied by a reduction in pay or benefits).  A lateral transfer that is not accompanied by a reduction in pay or benefits may still be considered adverse where "the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way." *Id.*; *see Rodriguez v. Bd. of Educ. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 366 (2d Cir. 1980) (transfer to elementary school was adverse action where "radical change" to "profoundly different" program rendered "utterly useless" plaintiff's twenty years of experience and study); *Alvarado v. Metro. Transp. Auth.*, No. 07-CV-3561, 2012 WL 1132143, at *7 (S.D.N.Y. Mar. 30, 2012) ("reassignment [that] would require [plaintiff] to undergo training and recertification and would render largely unusable her eight years of experience" plausibly alleged adverse employment action).  But Plaintiff has failed to explain how becoming a solutions architect altered the terms and conditions of his employment in a materially negative way.  For example, he mentions that

he had to support global projects in this role, but he does not articulate why this was a bad thing. (*See* P's Decl. ¶ 35.)[30]  *Cf. James v. Mun. Credit Union*, No. 13-CV-4568, 2016 WL 698136, at *7 (S.D.N.Y. Feb. 19, 2016) (change in hours and longer commute from lateral transfer was not adverse action).  Plaintiff's apparent preference to not work on global projects, without more, is not a materially adverse change in the terms and conditions of his employment.  *See Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 17 (2d Cir. 2017) (summary order) ("[I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer an adverse employment action.") (cleaned up); *Nicholls v. Brookdale Univ. Hosp. & Med. Ctr.*, 205 F. App'x 858, 861 (2d Cir. 2006) (summary order) (conclusory assertions that a position is undesirable because it tended to require more work than others are insufficient to survive summary judgment).

Even if any of these incidents of alleged disparate treatment affected the terms or conditions of Plaintiff's employment, Defendants have met their burden of articulating legitimate, nondiscriminatory reasons for their decisions regarding the CEO club and 2019 trainings, and Plaintiff has failed to demonstrate that the proffered reasons are pretextual.[31] Plaintiff asserts that he was treated differently than similarly situated employees because Evans allegedly recommended a white, non-Muslim, non-Pakistani, younger employee over Plaintiff

---

[30] Plaintiff does not explain what disadvantage there is to supporting global projects, and concedes that the solutions architect position involved less travel than the solutions engineer position, which involved "quite a lot" of travel.  (Doc. 154-2 at 186:3-187:13.)

[31] Defendants contend that Plaintiff has failed to establish a *prima facie* case that Plaintiff's move from solutions engineer to solutions architect constitutes disparate treatment, but they do not argue a legitimate, nondiscriminatory reason for this personnel decision in the alternative.  (*See* Ds' Mem. at 14; Ds' Opp. at 12.)

for the CEO Club.  (P's Mem. at 4-5; P's Decl. ¶ 91.)  But the only evidence Plaintiff cites that

Evans recommended this employee over Plaintiff is a LinkedIn conversation with a former

colleague who was "99% sure" Evans recommended another employee over Plaintiff.  (Doc.

181-9 at 9.)  This conversation is inadmissible hearsay, but even if it were not, there is no

evidence that Evans's recommendation was related to any protected characteristic.  Plaintiff

alleges that this other employee "did not sell any SD-WAN," (P's Decl. ¶ 91), and sold hardware

instead, (Doc. 180-18 at 75:8-20), but this does not appear to have been a qualification for the

CEO Club, (*see* Doc. 154-39 at TI-00618).  Assuming that Evans did recommend this employee

over Plaintiff, though, Defendants have articulated a legitimate, nondiscriminatory reason for

doing so:  Plaintiff's conduct did not accord with one of the criteria for the CEO Club –

subscription to Teneo's values.  (Ds' Mem. at 11-12.)  It would hardly be surprising if Evans had

not recommended Plaintiff for this award when, one month earlier, Plaintiff had posted a reply

on a social networking site that Evans found disrespectful.  (*See* Doc. 154-19.)  Moreover, it is

undisputed that two of the ten winners shared Plaintiff's protected traits, (Carey Aff. ¶¶ 13-14;

Doc. 154-39 at TI-00620, TI-00628; *see* note 7 above), which undermines any inference that the

award-selection process was discriminatory.

Defendants have also articulated legitimate, nondiscriminatory reasons why Plaintiff did

not attend the Cisco and Silver Peak trainings in 2019.  Teneo did not grant Plaintiff's request to

attend the 2019 Cisco conference in California because it was too costly, in contrast to the 2019

Cisco conference in Spain, for which free tickets were available to the U.K.-based employees

who attended but which Plaintiff did not request to attend.  (Doc. 154-28 at TI-000208; Ds' 56.1

Stmt. ¶¶ 102-105; *see* note 1 above.)[32]  Teneo had only two free tickets to attend the 2019 Silver

Peak training, and Ayres and Sabol were selected to attend because they could benefit from

additional training on that product, whereas Plaintiff already had years of experience with Silver

Peak and did not need the training.  (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶ 106; *see* note 1

above.)

Ultimately, Plaintiff offers only his unsupported, subjective belief that the above actions

were discriminatory.  For example, his only basis for believing that he was discriminated against

when he was not chosen for the CEO club is that he "felt it."  (Doc. 180-18 at 75:21-76:11.)

Such conclusory allegations are insufficient for Plaintiff to meet his burden of demonstrating

pretext.  *See Hill*, 467 F. Supp. 2d at 358 ("Evidence of disparate treatment cannot be based on

conclusory allegations.").

Because Plaintiff has not established that the incidents of alleged disparate treatment

affected the terms or conditions of his employment or, alternatively, because Plaintiff has not

met his burden of establishing that Defendants' legitimate, nondiscriminatory reasons for its

actions were pretextual, Defendants are entitled to summary judgment on Plaintiff's disparate

treatment claims.

**E.**     **Hostile Work Environment**

Plaintiff alleges that various incidents at his workplace created a hostile work

environment.  To prove a hostile work environment claim, "a plaintiff must establish that the

workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive

---

[32] This Cisco conference involved the same training that Plaintiff alleges he was "forced"
to attend in 2018.  (P's Mem. at 23.)

working environment." *Legg v. Ulster County*, 979 F.3d 101, 114 (2d Cir. 2020) (cleaned up).

"This showing has both objective and subjective elements:  the misconduct shown must be

severe or pervasive enough to create an objectively hostile or abusive work environment, and the

victim must also subjectively perceive that environment to be abusive." *Id.* (cleaned up).

Furthermore, a plaintiff must demonstrate that the conduct occurred "because of" the plaintiff's

protected status and "that a specific basis exists for imputing the conduct that created the hostile

environment to the employer." *Agosto*, 982 F.3d at 102 (cleaned up).

      "The objective hostility of a work environment depends on the totality of the

circumstances, viewed from the perspective of a reasonable person in the plaintiff's position,

considering all the circumstances[,] including the social context in which particular behavior

occurs and is experienced by its target." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir.

2012) (cleaned up).  Accordingly, courts must take care "not to view individual incidents in

isolation" or "view the record in piecemeal fashion." *Id.*  Factors considered as part of the

totality of the circumstances include "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with the victim's job performance." *Legg*, 979 F.3d at 114-15 (cleaned

up).

      To be deemed "pervasive," discriminatory incidents "must be more than episodic; they

must be sufficiently continuous and concerted." *Agosto*, 982 F.3d at 102 (cleaned up).  A single

incident may suffice to create a hostile work environment, "but to do so it must be

extraordinarily severe." *Id.* (cleaned up).  "A plaintiff need not show that her hostile working

environment was both severe and pervasive; only that it was sufficiently severe or sufficiently

pervasive, or a sufficient combination of these elements, to have altered her working conditions."

*Rodriguez v. County of Nassau*, 830 F. App'x 335, 339 (2d Cir. 2020) (summary order) (cleaned up).  Antidiscrimination laws, however, do not "set forth a general civility code for the American workplace," *Redd*, 678 F.3d at 176 (cleaned up), and do not "prohibit employers from maintaining nasty, unpleasant workplaces," *Krasner v. HSH Nordbank AG*, 680 F. Supp. 2d 502, 513 (S.D.N.Y. 2010).

"The question of whether a work environment is sufficiently hostile . . . is one of fact," and "summary judgment is appropriate only if it can be concluded as a matter of law that no rational juror could view the defendant's conduct as an intolerable alteration of the plaintiff's working conditions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) (cleaned up). "While this determination may involve difficult line-drawing that is sometimes best left for a jury, summary judgment is appropriate when reasonable minds could not differ on the issue of whether a work environment is hostile." *O'Dell v. Trans World Ent. Corp.*, 153 F. Supp. 2d 378, 386 n.3 (S.D.N.Y. 2001) (cleaned up), *aff'd*, 40 F. App'x 628 (2d Cir. 2002) (summary order).

Here, none of the alleged conduct, considered in combination, amounts to a discriminatory hostile work environment.

### 1.     Sabol's Alleged Use of Racist Terms

Starting with Sabol's alleged conduct – his use of the terms "redneck" and "Paki" during a single incident – while "offensive and inappropriate," does not fall into the category of "extraordinarily severe" isolated occurrences that create a hostile work environment.  *Agosto*, 982 F.3d at 103; *see Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("[M]ere utterance of an epithet which engenders offensive feelings in a[n] employee does not sufficiently affect the conditions of employment . . . .") (cleaned up); *Dabney v. Christmas Tree Shops*, 958 F. Supp.

2d 439, 459 (S.D.N.Y. 2013) (collecting cases), *aff'd sub nom. Dabney v. Bed Bath & Beyond*, 588 F. App'x 15 (2d Cir. 2014) (summary order).[33]

Additionally, an employer is liable for harassment by a nonsupervisory coworker (such as Sabol – a solutions engineer) only "if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 (2d Cir. 2011) (cleaned up); *see Petrosino v. Bell Atl.*, 385 F.3d 210, 225 (2d Cir. 2004); *see also Hoag v. Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 482 (S.D.N.Y. 2017) (an employer "cannot be liable for a comment made by Plaintiff's coworker where Plaintiff never reported the comment to anyone"); *Toyama v. Hasaki Rest., Inc.*, No. 13-CV-4892, 2014 WL 7234602, at *3 (S.D.N.Y. Dec. 18, 2014) (employer entitled to summary judgment on hostile work environment claim where "Plaintiff testified that she never reported the alleged . . . incident to her superiors or to anyone else"). Here, Plaintiff has not established that there was no reasonable avenue to complain of the conduct at Teneo – which had a responsive human resources department led by Head – and it is undisputed that Plaintiff did not notify anyone at Teneo about his argument with Sabol until June 18, (Ds' 56.1 Stmt. ¶ 83; *see* note 1 above), after which Teneo took immediate remedial action by speaking to Sabol about the issue and having him attend a diversity and inclusion workshop, (Doc. 154-28 at TI-000208; Ds' 56.1 Stmt. ¶¶ 111-112; *see* note 1 above). Consequently, even if Sabol's conduct were sufficiently severe to create a hostile work environment, Teneo still would not be liable.

---

[33] Sabol is alleged to have used the term "redneck" in describing himself. A "redneck" could be perceived as someone who is prejudiced, and therefore Sabol's use of the term to describe himself could cause offense, but the alleged comment is not as harmful as a slur, such as "Paki," directed at another person.

### 2.  Alleged Shouting Incidents

Plaintiff also alleges that he was yelled at, shouted at, or berated on a number of occasions:  (1) Sabol yelled at him in March 2019, (P's Mem. at 9, 28), (2) a U.K.-based employee shouted at him twice, (*id.* at 4; P's Decl. ¶ 100; Doc. 154-2 at 144:10-147:24), (3) Evans and Ayres shouted at him on one occasion, (P's Decl. ¶ 2A), (4) Evans berated him in October 2016, (P's Mem. at 5; P's Decl. ¶ 9), and (5) another Teneo employee berated him in October 2016, (P's Mem. at 5; P's Decl. ¶ 53).

First, it is not clear that Plaintiff's view of hostile conduct is objectively reasonable. Although Plaintiff alleges that Evans "berated" him on October 14, 2016, (P's Mem. at 5; P's Decl. ¶ 9), the evidence he cites in that regard either has nothing to do with that alleged incident, (*see* Doc. 180-17 at 39-40 (discussing Plaintiff's introduction to Teneo)), or concerns an innocuous email, (Doc. 181-19 at 2 (October 12, 2016 email in which Evans points out a typo in Plaintiff's email to a customer and writes, "Please be sure to double check customer facing emails to make sure there are no such errors.  First impressions are critically important as I'm sure you know.  Thanks.")).  But I will assume Evans did something else that amounts to "berat[ing]."

Second, there is no evidence that any of these incidents occurred because of Plaintiff's membership in a protected class.  For example, Plaintiff asserts that a Teneo employee "berated" him in October 2016.  (P's Mem. at 5; P's Decl. ¶ 53.)  In support of this allegation, one of Plaintiff's former colleagues submitted an affidavit attesting that this Teneo employee "loudly berated" Plaintiff and another employee on one occasion about training scheduling.  (Doc. 163-27 at 40.)  But there is no indication that this was because of a protected characteristic:  there is no evidence that the other employee who was berated shared Plaintiff's protected characteristics,

48

and the affiant attested that "[i]t was not unusual for the management to publicly shame an account executive or Solutions Engineer."  (Doc. 163-27 at 40.)  Thus, to the extent that Teneo employees shouted at Plaintiff, the evidence shows that it was because people sometimes shout in stressful work situations, not because he belonged to a protected group.  *See Sherman v. Fivesky, LLC*, No. 19-CV-8015, 2020 WL 2136227, at *5 (S.D.N.Y. May 5, 2020) ("Conduct that is offensive but that is directed at and impacts members of protected classes equally is not actionable . . . .  'Put bluntly, the equal opportunity harasser escapes the purview of [discrimination] liability.'") (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 n.88 (2d Cir. 2019)); *see Dabney*, 958 F. Supp. 2d at 457 n.17 ("Simply put, animosity on the job is not actionable.") (cleaned up).

Third, even if all of these incidents occurred because of Plaintiff's membership in a protected class, they are neither severe enough nor pervasive enough to create a hostile work environment.  *See Cristofaro v. Lake Shore Cent. Sch. Dist.*, 473 F. App'x 28, 30 (2d Cir. 2012) (summary order) (affirming summary judgment for defendants where "the record indicates only limited, infrequent, and at worst, mildly offensive conduct falling well short of the severity and frequency required to raise a triable issue of fact as to the existence of an objectively hostile work environment"); *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("Generally, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.") (cleaned up); *Kearse v. ATC Healthcare Servs.*, No. 12-CV-233, 2014 WL 958738, at *8-9 (S.D.N.Y. Mar. 11, 2014) (repeated reprimands in front of other coworkers, keeping plaintiff at work past end of shift, ignoring plaintiff's questions about his paychecks, supervisors' restricting of plaintiff's use of his paid time off, and comment that plaintiff was getting married to avoid paying child support together did not amount to hostile

work environment); *Divers v. Metro. Jewish Health Sys.*, No. 06-CV-6704, 2009 WL 103703, at

*16 (E.D.N.Y. Jan. 14, 2009) (noting that shouting "may be a rude breach of etiquette but it is

hardly sufficient to alter one's working conditions"), *aff'd*, 383 F. App'x 34 (2d Cir. 2010)

(summary order); *Salerno v. City Univ. of N.Y.*, No. 99-CV-11151, 2003 WL 22170609, at *10

(S.D.N.Y. Sept. 18, 2003) ("four isolated incidents spanning a ten-year period" did not amount to

hostile work environment).

### 3.    Miscellaneous Incidents

Additionally, Plaintiff asserts that Evans and Ayres "harassed" him by asking him to

work on global rather than U.S. projects.  (P's Mem. at 4, 6; P's Decl. ¶¶ 2A, 11.)  Plaintiff has

failed to explain how working on global projects constitutes harassment, and even if it could,

Plaintiff has not produced any evidence suggesting that Evans and Ayres asked him to work on

global projects because Plaintiff belonged to a protected class.

Plaintiff also alleges that miscellaneous conduct by Evans constitutes harassment, such as

when Evans did not call him during his interview, because a white, non-Muslim employee who

was not from Pakistan had a heart attack, (P's Mem. at 5; P's Decl. ¶ 9), and when Evans

emailed Plaintiff while he was having a family emergency on April 26, 2017 and advised him of

his options for leave, (*see* P's Mem. at 5, 9; P's Decl. ¶ 9).  But this conduct is not even

objectively offensive, let alone sufficiently severe or pervasive enough to create a hostile work

environment.

Finally, Plaintiff asserts that a Teneo employee "harassed" him in January 2017.  (P's

Mem. at 5; P's Decl. ¶ 53.)  This employee sent Plaintiff an email asking him to "[p]rovide the

names of the retail organizations where you have relationships so we can target them

appropriately" and "[i]ndicate any accounts or people [with whom] you have personal

relationships that you would prefer me not to engage with" so that Plaintiff could "approach them as [he] see[s] fit." (Doc. 163-9 at 4.) Plaintiff responded that he would not provide the names and did not want to reach out, and added, "Please stop. This is [h]arassment." (*Id.*) Even if Plaintiff subjectively perceived this to be harassment, this type of request is not objectively hostile or abusive. Additionally, like so many of Plaintiff's alleged instances of harassment, there is no indication that this conduct was directed at Plaintiff because of a protected characteristic.

In the end, almost all of the conduct that allegedly created a hostile work environment for Plaintiff consists of nothing more than ordinary workplace tension, and there is no evidence that it was directed at Plaintiff because he belonged to a protected group. *See Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race.") (cleaned up); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at *42, 63 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class") (cleaned up).

Considering the totality of the circumstances, Plaintiff has failed to establish that his workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Legg*, 979 F.3d at 114. Accordingly, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claims.

**F.**   **Failure to Accommodate**

Finally, Plaintiff asserts a failure-to-accommodate claim on the basis that he requested an accommodation to not travel after his back injury but never received one, and was forced to lift things in the course of installing equipment.  (P's Mem. at 3-4, 15-16.)  To make out a *prima facie* case of failure to accommodate, a plaintiff must establish that "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (cleaned up).

**1.**   **Disability Under the ADA**

To establish a disability, a plaintiff must (1) "show that she suffers from a physical or mental impairment," (2) "identify the activity claimed to be impaired and establish that it constitutes a major life activity," and (3) "show that her impairment substantially limits the major life activity previously identified."  *Weixel v. Bd. of Educ.,* 287 F.3d 138, 147 (2d Cir. 2002) (cleaned up); *see Bragdon v. Abbott,* 524 U.S. 624, 631 (1998); *Brandon v. O'Mara,* No. 10-CV-5174, 2011 WL 4478492, at *5 (S.D.N.Y. Sept. 28, 2011).

An impairment need not be permanent or chronic to qualify as a "disability" under the ADA.  *Hamilton v. Westchester County*, 3 F.4th 86, 93 (2d Cir. 2021) ("[U]nder the expanded definition of 'disability' under the [2008 ADA Amendments Act], which now covers impairments lasting or expected to last less than six months, a short-term injury *can* qualify as an actionable disability under the ADA.") (emphasis in original) (cleaned up).

The 2008 ADA Amendments Act (ADAAA) "ma[d]e clear that the clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one,"

*Hamilton*, 3 F.4th at 92 (cleaned up); *see* 29 C.F.R. § 1630.2(j)(1)(i), and "should not demand

extensive analysis," 29 C.F.R. § 1630.2(j)(1)(iii); *see Brtalik v. S. Huntington Union Free Sch.

Dist.,* No. 10-CV-0010, 2012 WL 748748, at *4 (E.D.N.Y. Mar. 8, 2012).

> An impairment is a disability within the meaning of this section if it substantially
> limits the ability of an individual to perform a major life activity as compared to
> most people in the general population.  An impairment need not prevent, or
> significantly or severely restrict, the individual from performing a major life
> activity in order to be considered substantially limiting.  Nonetheless, not every
> impairment will constitute a disability within the meaning of this section.

29 C.F.R. § 1630.2(j)(1)(ii); *see Parada v. Banco Indus. De Venez., C.A.*, 753 F.3d 62, 69 (2d

Cir. 2014).  This inquiry "usually will not require scientific, medical, or statistical analysis,"

although such evidence is of course not prohibited, 29 C.F.R. § 1630.2(j)(1)(v); *Clark v. Stop &

Shop Supermarket Co.*, No. 5-CV-304, 2016 WL 4408983, at *4 (D. Conn. Aug. 16, 2016), and

is made "without regard to the ameliorative effects of mitigating measures," 42 U.S.C.

12102(4)(E); 29 C.F.R. § 1630.2(j)(1)(vi).  In determining whether an individual is disabled

under the ADA, the Second Circuit has "rejected bright-line tests" and instructed courts to

engage in a "fact-specific inquiry."  *Parada*, 753 F.3d at 69.  Appropriate considerations include

"the difficulty, effort, or time required to perform a major life activity; pain experienced when

performing a major life activity; the length of time a major life activity can be performed; and/or

the way an impairment affects the operation of a major bodily function."  29 C.F.R. §

1630.2(j)(4)(ii).

The ADA also provides that "major life activities include, but are not limited to . . .

lifting" as well as "the operation of major bodily functions, including . . . bowel [and] bladder

functions." 42 U.S.C. § 12102(2).  Sitting is also a major life activity for purposes of the

disability analysis.  *Parada*, 753 F.3d at 69.

Plaintiff was injured on September 25, 2017.  (Doc. 154-32; Ds' 56.1 Stmt. ¶¶ 120-121; *see* note 1 above.)  On November 3, 2017, due to this injury, Plaintiff's doctor purportedly restricted him from "lifting from floor, squatting, or bending," indicated he should lift no more than ten pounds, and noted "No travel due to back injury until further notice."  (Doc. 163-12 at 7.)[34]  Plaintiff saw a different doctor on November 27, 2017, who noted that Plaintiff's pain and incontinence issues persisted at that time (although that doctor did not state whether Plaintiff should continue to be restricted in his work).  (Doc. 154-34 at TI-00534 to 37.)

Plaintiff traveled out of state in December 2017, (P's 56.1 Resp. at 28; Doc. 163-9 at 11-16), to Florida in June 2018, (Doc. 154-36; Ds' 56.1 Stmt. ¶¶ 144-145; *see* note 1 above), to the United Kingdom in February 2019, (Ds' 56.1 Stmt. ¶¶ 148-150; P's 56.1 Resp. at 28; P's Decl. ¶ 50), to Maryland and Illinois in April 2019, (Doc. 181-13 at 4-7), and to an unstated location in June 2019, (Ds' 56.1 Stmt. ¶ 141; P's Mem. at 23-24).[35]  Plaintiff testified that his back injury resulted in limited control over his bladder and bowels, that he would often lose control of these functions, and he began to travel with a second pair of pants as a result of the problem.  (Doc. 180-21 at 192:3-24, 193:14-19.)  Plaintiff also testified that travelling caused him "pain," explaining specifically that "the pain was there.  You cannot stand up."  (Doc. 180-21 at 192:18-24.)  His medical records reflect that he reported symptoms of incontinence and pain to doctors at his November 3 and November 27 appointments.  (Doc. 154-34 at TI-00534 to 41.)

---

[34] As noted above, (*see* note 19 and accompanying text above), Defendants dispute the authenticity and admissibility of this note, (Ds' 56.1 Stmt. at 20 n.6), but it (if admissible) or testimony by its author would be evidence of disability.

[35] The parties dispute the extent to which this travel was voluntary or requested by Plaintiff.  (*Compare* P's Decl. ¶¶ 50-51, 92, 98, *and* Doc. 154-2 at 158:13-15, *with* Ds' 56.1 Stmt. ¶¶ 141.).

Defendants argue that Plaintiff could not be disabled with regard to travel (or, alternatively, that he needed no accommodation) because he did in fact travel.  (Doc. 152 at 25-26.)  But Plaintiff is not required to show that travel was impossible.  *Parada*, 753 F.3d at 69. His testimony regarding his difficulty sitting and the incontinence caused by his injury – both of which were exacerbated, according to him, by travel – are sufficient bases from which a reasonable juror could conclude that Plaintiff had a disability under the ADA based on substantial limitations to the major life activities of sitting and the operation of bodily functions. *See* 42 U.S.C. § 12102(2) ("[M]ajor life activities include, but are not limited to . . . the operation of major bodily functions, including . . . bowel [and] bladder functions . . . ."); *Parada*, 753 F.3d at 69 ("If a plaintiff offers evidence that she cannot sit for a prolonged period of time, she may well be disabled under the ADA, depending on her specific factual circumstances."); *cf. Hamilton*, 2021 WL 2671311, at *5 ("[F]ollowing the enactment of the ADAAA, for purposes of establishing a disability under the ADA, the term 'substantially limits' should now be construed broadly in favor of expansive coverage, to the maximum extent permitted.") (cleaned up).

A jury could also conclude that Plaintiff was substantially limited in performing the major life activity of lifting.  His doctor's note stated that as of November 3, 2017, he should not lift more than ten pounds or from the floor.  (Doc. 163-12.)  It is uncontested that Plaintiff was asked to and did perform a hardware installation on December 3, 2017.  (*See* Ds' 56.1 Stmt. ¶ 125; Doc. 180-20 at 159:8-23.)  Plaintiff testified that he had to "manage[] his pain" in order to complete the installation.  (Doc. 180-21 at 184:15-17.)  Thereafter, Plaintiff declined to perform any more installations, (*id.* at 183:16-19), and his wishes were honored, (Doc. 154-2 at 163:14-17; Ds' 56.1 Stmt. ¶ 108; *see* note 1 above).  Construing this evidence in a light most favorable to the Plaintiff, a rational factfinder could conclude that Plaintiff's back injury substantially

limited his ability to lift. *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 264 (E.D.N.Y. 2015) (holding that a back injury that prevented plaintiff from lifting more than twenty pounds "may be, for purposes of [a summary judgment] motion, considered a disability under the ADA post passage of the ADAAA").

### 2.    Teneo's Notice of Plaintiff's Disability

Regarding the second element, which concerns notice, "[a]n employee must . . . tell his employer about [his] disability before [his] employer has any obligation to accommodate the disability." *MacEntee v. IBM (Int'l Bus. Machs.)*, 783 F. Supp. 2d 434, 443 (S.D.N.Y. 2011) (cleaned up), *aff'd*, 471 F. App'x 49 (2d Cir. 2012) (summary order). "It is also the employee's responsibility to demonstrate to an employer that she needs an accommodation for reasons related to a medical condition disability." *Id.* General awareness that a plaintiff suffered from certain medical conditions is insufficient. *See id.* at 443-44. In *MacEntee*, for example, this Court dismissed a failure-to-accommodate claim where the plaintiff "fail[ed] to provide medical documentation" or "notify her supervisor of her unknowable [psychiatric] limitations" because she gave her employer "no notice of her disability and . . . [no] opportunity to offer, or refuse, . . . reasonable accommodations." *Id.* at 444. But "if the employer knew or reasonably should have known that the employee was disabled," that employer has an "obligation" to "engage in an interactive process . . . and in that way work together to assess whether an employee's disability can be reasonably accommodated." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (cleaned up).

It is undisputed that Plaintiff did not provide Teneo with any doctors' notes while he was employed there. (Doc. 154-2 at 157:18-158:3; Ds' 56.1 Stmt. ¶ 124.) Even so, Teneo had more than a general awareness that Plaintiff had injured his back. Evans and Head acknowledged that

they had discussed the specifics of Plaintiff's MRI results with Plaintiff in October 2017.  (*See* Doc. 154-33.)  Plaintiff alleges that he asked Evans for "some accommodation" regarding travel because of his back.  (Doc. 180-21 at 187:24-188:14.)  Evans' October 20, 2019 email to Head and Carey, on the other hand, suggests that Plaintiff disclaimed any inability to travel.  (Doc. 154-33.)  Construing the evidence in the light most favorable to Plaintiff, he did not fail to notify Teneo of unknowable limitations:  his alleged request for a travel accommodation was sufficient to trigger Teneo's duty to engage in an "interactive process" with Plaintiff to assess whether Plaintiff's disability with regard to travel could be "reasonably accommodated."  *Brady*, 531 F.3d at 135 (cleaned up).  Defendants have not offered evidence to show that they followed through on such a process – the record reflects that the question of the impact of Plaintiff's injury on his travel was raised but not pursued by Teneo.  (Doc. 154-33.)[36]  Given this evidence, there is a question of fact regarding whether Teneo had notice that Plaintiff was substantially limited in his ability to travel.

But the same cannot be said for Plaintiff's disability with regard to lifting.  Plaintiff only performed one installation after his injury, on December 3, 2017.  (*See* Doc. 154-2 at 162:25-163:17; Doc. 163-9 at 30.)  Plaintiff did not ask to be excused from or ask for any

---

[36] Evans states in his affidavit that he "raised preventative actions" with Plaintiff in a phone call on October 20, 2017, and that Plaintiff told him he wanted to continue working. (Ds' 56.1 Stmt. ¶ 122; Evans Aff. ¶ 25.)  It is not clear, from this account, what "preventative actions" were discussed and whether those included a modification or restriction to Plaintiff's work-related travel going forward.  Plaintiff states that he asked for travel accommodations but never heard back.  (Doc. 180-20 at 155:24-156:10; Doc. 180-21 at 188:1-11.)  Evans's October 20, 2017 email to Head and Carey suggests both that Plaintiff disclaimed a desire for any accommodation and that Teneo was still considering one but did not follow up on the issue. (Doc. 154-33.)  To the extent the "interactive process" broke down, responsibility for this breakdown is unclear and the Court cannot grant summary judgment.  *See Berger v. N.Y. City Police Dep't*, 304 F. Supp. 3d 360, 371-72 (S.D.N.Y. 2018) (denying summary judgment where "a reasonable trier of fact could find that Plaintiff was not responsible for the breakdown of the interactive process").

accommodation regarding that installation, (Doc. 180-20 at 159:8-23), and he did not provide any documentation regarding any limitations on his ability to lift, (Doc. 154-2 at 157:18-21).[37] Therefore, his failure-to-accommodate claim with regard to the December 3, 2017 installation cannot go forward.[38]

### 3.     Whether Reasonable Accommodation Was Possible

The third element asks whether Plaintiff could have performed his essential job functions while being provided reasonable accommodation for his disability.  Mr. Evans testified via affidavit that Plaintiff was not required to travel for his job if he declined to do so.  (Evans Aff. ¶ 26.)  This statement suggests that some accommodation adjusting Plaintiff's travel requirements was reasonable under the circumstances, and that Plaintiff would have been able to fulfill the essential requirements of his job with these accommodations in place, to the extent they were not.

### 4.     Refusal to Grant Reasonable Accommodation

Finally, as discussed above, there is some evidence that Plaintiff sought an accommodation with regard to travel and that Defendants did not follow up.  (Doc. 154-33.) There is also some evidence that Plaintiff declined any accommodation because "not working won't make his back feel better," (*id.*), and that he was not required to travel if he declined, (Evans Aff. ¶ 26.  It is undisputed that Plaintiff traveled for work on several occasions, but Plaintiff asserts, and Defendants dispute, that he was forced to take these trips against his will.

---

[37] While Plaintiff alleges that Evans "should have known" Plaintiff was limited in lifting on December 3, 2017, (Doc. 180-20 at 159:23), he concedes that "the only thing [he] told Steve [Evans], the travel, that there should be a limit for the travel," (Doc. 154-2 at 182:15-16).

[38] It is undisputed that after December 3, 2017, Teneo did not require Plaintiff to do any lifting.  (Doc. 154-2 at 163:14-17.)

(*See* note 35 and accompanying text above.)  There is thus a triable question of fact as to whether Defendants failed to accommodate Plaintiff's disability by requiring him to travel in the wake of his request for an accommodation.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part.  All claims are dismissed except Plaintiff's ADA failure-to-accommodate claim as it relates to travel.  Plaintiff's cross-motion for summary judgment is DENIED.  The Clerk of Court is respectfully directed to terminate the pending motions.  (Docs. 151, 163.)  The parties shall attend a telephonic status conference on August 12, 2021, at 12:00 p.m.

**SO ORDERED.**

Dated:  August 4, 2021
           White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.