20208rgilacf

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   --------------------------------x

3   ASAD GILANI,

4                   Plaintiff,

5            v.                          20 CV 1785(CS)

6                                        CONFERENCE

7   TENEO, INC., et al.,

8                   Defendants.

9   --------------------------------x

10

11                                   United States Courthouse
                                     White Plains, New York
12                                   August 27, 2020

13

14

15

16  Before:   THE HONORABLE PAUL E. DAVISON, Magistrate Judge

17

18                          APPEARANCES

19

20  ASAD GILANI
        Plaintiff pro se

21

22  WRIGHT, CONSTABLE & SKEEN, LLP
        Attorneys for Defendants
23  MARC ANDREW CAMPSEN

24

25  *Proceeding recorded via digital recording device.


          CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                    (914)390-4103

2020Bilani

```
 1              THE COURT:  This is the Gilani case.

 2              I have Mr. Gilani pro se, correct?

 3              MR. GILANI:  Yes, your Honor.

 4              THE COURT:  And who do I have as defense counsel?

 5              MR. CAMPSEN:  Mr. Campsen, your Honor.

 6              THE COURT:  Good afternoon, Mr. Campsen.

 7              All right.  We last spoke on July 31st.  In the

 8   intervening three weeks, there have been 15 filings on the

 9   docket.

10              Mr. Gilani.

11              MR. GILANI:  Yes.

12              THE COURT:  Are you listening?

13              Mr. Gilani, I have a premotion letter requirement and

14   I'm going to direct you going forward to adhere to that.  You

15   can't just file a motion because you think it's a good idea.

16   You have to submit a letter and request permission to file the

17   motion because, otherwise, we wind up with situations like

18   this, where I've got enormous amounts of material on the

19   docket.  And I'm a fast reader, but I've got to tell you,

20   Mr. Gilani, you are really testing my capacity to absorb

21   information here.

22              Now, I've got something sitting here that I want to

23   tell you, Mr. Gilani, which is that you apparently subpoenaed

24   some documents from Verizon --

25              MR. GILANI:  Yes, your Honor.
```

1          THE COURT:  -- and they returned the subpoena to the

2     courthouse, and I am told that you tried to collect the

3     documents yesterday and they wouldn't give them to you.  But I

4     am sending them back down to the Clerk's Office with

5     instructions to release them to you.  So you should ask for

6     Andrea in records and they'll give you those documents.

7          MR. GILANI:  Thank you, your Honor.

8          THE COURT:  You did make defense counsel aware of the

9     subpoena, correct?

10         MR. GILANI:  Yes, yes.  He was notified.  And I also

11    posted it on ECF, service of the subpoena.

12         THE COURT:  All right.

13         Mr. Campsen, not to be mysterious, this is apparently

14    a subpoena for Mr. Gilani's own phone records.

15         MR. CAMPSEN:  Correct.

16         THE COURT:  And they have returned I believe it's 37

17    pages of phone records.  And Mr. Gilani will collect those from

18    the clerk and get them off my desk.

19         All right.  To try to address things in order, the

20    first -- well, actually, before we start wading through the

21    docket, Mr. Campsen, can I ask you to just bring me up to date

22    on what has transpired since July 31st in terms of the general

23    progress of discovery here.

24         MR. CAMPSEN:  Yes, your Honor.

25         I think we're close despite the filings, which is an

```
1    issue to be addressed later.  But in my notes, your Honor, I
2    did a -- I pulled the docket.  I have five categories here of
3    filings.  I won't go through each filing, but the first
4    category -- and this is by date going back to July 30th.
5              THE COURT:  Yes, I'm not asking you to review the
6    docket.  I'm asking what has occurred that I'm not aware of
7    that is moving us towards the goal line here.
8              MR. CAMPSEN:  Yes, your Honor.  All right.
9              So the only outstanding documents from plaintiff that
10   we've requested and that was addressed in our only filing since
11   July 30th, the first filing, is we had requested in --
12             THE COURT:  This is the damages stuff?
13             MR. CAMPSEN:  No.  He's given me a damages worksheet,
14   and I'll explore that in deposition, which is scheduled.  This
15   is about -- we had information that he was using another
16   company, maybe his own company, to attempt to partner with some
17   of Teneo's partners while he was employed.  And we have
18   documents that I produced, recorded conversations -- or --
19             THE COURT:  Once again, we're going to wade through
20   these disputes, but I just want to know what else, if anything,
21   has occurred since July 31st.
22             Have there been any further depositions?
23             MR. CAMPSEN:  Yes, your Honor.  I apologize.  We had
24   the deposition of Roy Ryland two days ago.  And I think that
25   may be the only deposition since we last spoke.  And there's
```

1    been other exchanges of documents.  So we're making progress.

2              THE COURT:  All right.  Are there any other

3    additional depositions contemplated at this point?

4              MR. CAMPSEN:  Yes, your Honor.  On December -- I'm

5    sorry -- September 22nd plaintiff's deposition is scheduled.

6              THE COURT:  Okay.

7              MR. CAMPSEN:  Oh, also -- sorry to interrupt, your

8    Honor -- on September 10th the deposition of Rachel Head, HR

9    for Teneo, is also scheduled.

10             THE COURT:  Right.  Okay.  Very good.  All right.  So

11   we are making some progress.

12             I cut you off, but the first pending application is

13   from defense counsel and you were starting to address that.

14             Now, you indicated you do have a damages worksheet

15   from plaintiff.

16             MR. CAMPSEN:  Correct.

17             THE COURT:  So the issue is any documentation

18   relating to his efforts to secure other employment while

19   employed by your client?

20             MR. CAMPSEN:  Well, not exactly.  So our company is

21   sort of a middleman in the products and he seemed -- our

22   understanding is that he seemed to be trying to partner with

23   our partners to take the business.  So not necessarily getting

24   employment, you know, trying to find another job while he's

25   working for us, but to actually have a side business.  And

```
1    again, this all may be proved untrue, but that's why we're in

2    discovery.  But he sort of had a side business trying to

3    partner with our existing partners while employed with us.  And

4    our reports are that he was using his wife's e-mail address to

5    do so.

6             THE COURT:  All right.  That's your request number

7    15?

8             MR. CAMPSEN:  Yes.

9             THE COURT:  And request number 16 pertains to

10   plaintiff's efforts to secure alternative employment since he

11   was terminated by your client.

12            MR. CAMPSEN:  Correct, your Honor.

13            THE COURT:  All right.  Anything else you're seeking

14   from him?

15            MR. CAMPSEN:  Well, related, request number 17 is

16   just any documents he got from his employer so we can confirm

17   his current employer or any employers he's had since he left

18   Teneo so I can confirm the damages.  And often times we

19   subpoena the employer, the new employer, for additional

20   documents.  And so we haven't received anything.  I don't even

21   know if he has a current job.

22            THE COURT:  All right.

23            Mr. Gilani.

24            MR. GILANI:  Yes?

25            THE COURT:  I want your response on these issues.  I
```

```
 1    mean, you have just sort of asserted on these first two items
 2    that it's burdensome and irrelevant.  Do you want to elaborate
 3    on any of that?
 4              MR. GILANI:  Yes.  The first one is basically they're
 5    asking about Riverbed and Riverbed is not their competitor, it
 6    is a partner of them.  So that's invalid.
 7              THE COURT:  Well, no, no, no, no, no.  What
 8    Mr. Campsen just said was that they have information that you
 9    were trying to work some kind of side deal with Riverbed.
10              MR. GILANI:  No.  I never did that.
11              THE COURT:  Well, you know, Mr. Gilani, this is fair
12    game.  If you were communicating with clients or competitors of
13    Teneo while you were employed with Teneo, using your wife's
14    e-mail or otherwise, that's fair game, and I'm going to direct
15    you to respond to that request.  Your objection is overruled.
16    Do you understand?
17              MR. GILANI:  Okay, okay.
18              THE COURT:  Moving on to the next subject, which is
19    your employment applications and other documentation relating
20    to efforts to secure other employment, this is clearly
21    relevant.  You have an obligation to mitigate damages and
22    defendants have a right to take discovery on that.  It's not
23    burdensome.  Your objection is overruled.  You need to provide
24    that.  Do you understand?
25              MR. GILANI:  Sure.
```

1          THE COURT:  With regard to your damages, I must say

2     you sent me this worksheet, or whatever it is.  I didn't really

3     understand.  Plaintiff is claiming wife privileged.  Apex

4     information provided.  It is on W-2.  What's the situation

5     here?  They're entitled to information about your earnings and

6     employment.

7          MR. GILANI:  Well, no, I can provide -- I can provide

8     that.  So it's my wife's company.  Right?  So she --

9          THE COURT:  You're working for your wife?

10         MR. GILANI:  During that time.  Right now, I'm on

11    W-2.

12         THE COURT:  Okay.

13         MR. GILANI:  During that time I was -- it was my

14    wife's company and she signed.  And she is the one who -- what

15    you call -- that's what I'm saying, that it's a wife privilege

16    because if there any confidential document signed, she signed

17    it.

18         THE COURT:  I don't understand.  If you're working

19    for your wife, you know, that's not a privileged spousal

20    communication.  That's an employment relationship.

21         MR. GILANI:  Yes.  She -- that's correct.  So I

22    can -- so what do you want me to provide them?  I mean, I can

23    provide whatever you say, Judge.

24         THE COURT:  All documents received by you from any

25    employer for any position in which you were employed or

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1   contracted to perform work after your termination.  Counsel

2   can -- you can confer about what specifically defendants are

3   looking for, but I would assume it would include any

4   documentation that shows what you were earning.  You know, that

5   could be pay stubs or a W-2 or anything like that.  As well as

6   anything indicating the work that you were doing.

7           MR. GILANI:  Okay.  I will do that, your Honor.

8           THE COURT:  You know, you're very quickly -- I don't

9   understand why you throw up these objections and then you

10  immediately don't defend them when they raise them with the

11  Court, Mr. Gilani.  If it's not objectionable, you should

12  simply be complying with discovery, not throwing up roadblocks.

13          MR. GILANI:  No, I'm not -- your Honor, I think -- I

14  believe -- I might not know, so, I mean, if I -- if you -- you

15  are the judge and if you say so, I will comply.

16          THE COURT:  All right.

17          Mr. Campsen, I think that exhausts your issues.

18          MR. CAMPSEN:  Yes, your Honor.

19          The only -- in going through the documents, there was

20  a company called -- and I'm bringing this up just because we're

21  talking about it.  There was a company I saw identified I think

22  in the damages worksheet, and I was going to explore this in

23  deposition, but it's a company called SAAS Networking, I

24  believe.  So just on the record I would -- we might as well

25  short-circuit any dispute later.  If we can include that with

1    the Apex information and any other information that he has
2    relevant to that company.
3              MR. GILANI:  That's my wife's company.
4              THE COURT:  That's your wife's company and you're
5    going to provide that.
6              MR. GILANI:  Yes.
7              THE COURT:  Okay.
8              MR. CAMPSEN:  Okay.  I just need to understand.
9    Okay.  Thank you.
10             THE COURT:  All right.  Working forward, Mr. Gilani,
11   you filed a couple of status reports.  I don't know what that's
12   all about, but you're not asking me to do anything, so I guess
13   I can leave that alone.
14             Plaintiff's motion to compel witness Brett Ayers to
15   provide correct answer.
16             Mr. Gilani, you want to elaborate on that?
17             MR. GILANI:  So, your Honor, on the affidavit I
18   asked --
19             THE COURT:  Let me short-circuit this.  Is this
20   approximately February 19th versus January?
21             MR. GILANI:  That is correct, your Honor.
22             THE COURT:  You know, Mr. Gilani, I -- and you're
23   trying to characterize that as perjury?
24             MR. GILANI:  No.  I'm just asking him that it is
25   incorrect what he said that in affidavit.  Because if he said

202081gllcf

1    that earlier --

2           THE COURT:  You know, if you've caught him in what

3    you think is a contribution, that's good for you.  If you get

4    to trial, you can confront him with that.  But I've got to tell

5    you, Mr. Gilani, to throw around terms like perjury when

6    somebody says approximately and then is one month off, I mean,

7    it's -- if you were sitting here in my courtroom, I would have

8    trouble believing you could say that with a straight face.

9           MR. GILANI:  Okay, your Honor.  I mean, basically,

10   there are two -- the reason what I did, there are two

11   allegations where I was discriminated on shouting in February

12   and that was the reason.  If they have February, approximately

13   February, then they come back on approximately March and that

14   was another incident.  Right?  But I --

15          THE COURT:  I think it was January versus February.

16   But in any event, Mr. Gilani, I'm denying that motion.  It's

17   really not a proper motion to begin with, and this is exactly

18   the kind of thing that I don't want you to be filing --

19          MR. GILANI:  Okay, your Honor.

20          THE COURT:  -- without leave of the Court, without a

21   short letter requesting leave to do it.

22          Motion for spoliation of evidence and severe fines

23   and sanctions against Teneo, Inc.

24          I'll hear you, Mr. Gilani.

25          MR. GILANI:  So they provided me with -- first of

2020filgilani

```
1    all, they provided me performance review of 2017, fourth
2    quarter, which I accepted, and they also provided me the second
3    quarter -- third -- third -- they provided me the fourth
4    quarter, which I accepted.  Third quarter they provided me, and
5    I denied that one.  That was never given to me.  And then they
6    also said that the first quarter was not available.  And that I
7    instantly, when I looked at that at that time, during that
8    time, it was exactly manipulation of the first quarter with
9    certain changes.  Right?  Certain things got changed.  There
10   was objective added and all the negative, derogatory comments
11   about me were added.  And I never received that one.  And then
12   when I requested the first one and they said they don't have
13   it.  I had the first one.  I have two of them.  The first one
14   was where my manager gave me 3.6 and then I said no, I'm not
15   3.6.  We discussed.  And then he went back to update it.
16              THE COURT:  And increased it.
17              MR. GILANI:  Yes, 3.-- 4.6 or something.  And then he
18   went back to the management and management said we don't give
19   that one, and then he gave me back to 3.6, which I don't
20   remember.  He never send me.  And when I looked at it, the
21   objective and the (INDISCERNIBLE).  So, for example, it says
22   on -- one of the example, it says we did not -- we made the 8-1
23   what you call US number.  And in this one it says you made the
24   QT number.  Objective exactly the same or they maneuver there.
25              So the reason I'm saying is that this is a -- when
```

```
1    you look at it -- and I apologize.  It took me two weeks to
2    just comprehend what was happening.  There was so many changes
3    were in this one.  It's exactly hundred percent.  It's like
4    even the training is hundred percent.  Even I can -- and I have
5    the first two document and I have the dates when they were
6    created.  When you go into the Word documents, you do info and
7    then you look at it and then you find out when was created, who
8    created it and how much time they spent.
9                 So, from my perspective, the reason I'm saying the
10   first one is -- is not -- the contents are good.  Ranking I
11   don't know.  I only -- I can -- I could have said, okay, I got
12   4.65, which I did not because I don't want to take credit if
13   that was not given at that time.  And the third quarter is all
14   fake.  Right?  So I was never given any, any of these issues,
15   never given this kind of performance plan.  And if I would have
16   been given performance plan with this kind of poor, I would
17   have been out, your Honor, in that same month.  But the second
18   month I got -- the fourth quarter I got 3.6.  Then I got the
19   raise of annual 3.6 in the (INDISCERNIBLE).  Then I got 3.8.
20                So basically what I'm saying, if I had been that poor
21   performance and had been given to me, I would have been out the
22   same day.
23                THE COURT:  But, Mr. Gilani, you're saying these
24   weren't given to you at the time?
25                MR. GILANI:  No.  That performance was -- that
```

202081gilaci

```
 1       performance is not my performance.  No.  You cannot have the

 2       same performance objectives of quarter 1, quarter 2 and quarter

 3       3.  This is insane.  If I would, I would say yes and I would --

 4       I mean, why would I stay at Teneo for three years where I been

 5       getting high performance.  And the reason it was never -- this

 6       is first time I saw on August 5th at 4:57 p.m., and right away

 7       I responded this is -- this is the same copy of my performance

 8       review of -- with -- performance review of quarter 2 with some

 9       modification.  And I would review modification.

10            And, your Honor, I had a hard time to really see.  I

11       had to go line-by-line item and spend at least 80 hours to

12       really outline what has happened.

13            And on the second thing, if you look at my

14       performance reviews, there's seven of them.  We never had more

15       than five objectives.  And these objectives were added into

16       this one.  And I can tell you (INAUDIBLE) because they

17       responded -- so I have two --

18            THE COURT:  You're sort of speculating about why

19       things were done.  I'm trying to understand.  These are

20       documents that you claim you never got back when you were

21       working there?

22            MR. GILANI:  No, I never got them.

23            THE COURT:  Okay.  Did you get copies of performance

24       reviews at these intervals?

25            MR. GILANI:  Yes, I did.
```

202081gilacr

1          THE COURT:  Do you have ones that are different than

2     the ones they're giving you now?

3          MR. GILANI:  I don't have that quarter 1, no.

4     Quarter 3 I don't have.

5          THE COURT:  All right.  I want to hear from -- you

6     know, you've attached numerous exhibits on filings as recently

7     as yesterday.  I'm going to go through all of this, Mr. Gilani.

8     I will admit I am having trouble following your argument, but

9     it may be that if I look at the documents, I'll understand it

10    better.

11         Mr. Campsen, can I get just sort of a general

12    response to this.

13         MR. CAMPSEN:  Yes, your Honor, and I'll be brief.

14         The Q4 review of Mr. Gilani said there's no issue.

15    It's included, but there's no issue.  He's not disputing that.

16         The Q3 review -- and these are across 2016 and 2017.

17    It's sort of a fiscal year as opposed to a calendar year.

18    That's why the dates are a little off with the quarters.  But

19    the Q3 review, as I said in my response, he's just saying that

20    it's wrong and highlighting things he thinks are wrong, but

21    there's absolutely no evidence to the contrary.

22         And what I didn't submit, and maybe I should have,

23    and I can certainly supplement it, but this has been produced

24    in Teneo's document production.  On May 23rd, 2017, his

25    supervisor, Steve Evans, sent him an e-mail.  "Subject:  Q3

review.  "Hi, Asad.  Attached is the Q3 review we discussed.
Please review and respond with your comments in the section
delineated for that."  And he goes on and has a couple more
points.  And then right behind it -- again, it's been produced
and Bates stamped -- is the Q3 review that is at issue here.
So he did receive it.  There's the e-mail documentation
supporting that.  And he has never said how it's wrong.

          MR. GILANI:  You just gave me that document.  First
time I saw was day before yesterday.  Right?

          MR. CAMPSEN:  No.  This is in our fourth document --
well, yes, right, on 8-25, I responded -- your Honor, your
Honor, may I?

          THE COURT:  One at a time, all right?  I'm listening
to Mr. Campsen right now, Mr. Gilani.

          MR. CAMPSEN:  So we produced that e-mail in
response -- we went back and found it in response to this --
these specious allegations of spoliation.  And he said he's
never seen the document, but it's an e-mail to him dated May
23rd, 2017.  I don't know what else to say other than he just
doesn't have the records.  But we have the e-mail documentation
and we have the attached performance review, which is the same
performance review that we produced earlier in this litigation.
So, one, he did receive it and, two, he hasn't identified any
evidence of anything that's wrong or altered other than his own
speculation.

                CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                         (914)390-4103

1           So there's absolutely no credibility to this,

2     particularly, your Honor, because he's claiming that Teneo's

3     counsel, including me, is party to altering documents, which

4     is -- he filed a public court filing.  And attorneys have to go

5     by their reputation.  So it's very disturbing, to say the

6     least, particularly when his accusations are demonstrably false

7     through these e-mails.

8           THE COURT:  All right.  Did you indicate that you

9     have some additional documentation that you haven't filed on

10    this?

11          MR. CAMPSEN:  Yes, your Honor.  So we filed our

12    response.  This particular e-mail chain showing that Mr. Gilani

13    got the Q3 review and that same Q3 review that was previously

14    produced we produced a few days ago.  I can submit that this

15    afternoon, or right after this call.

16          THE COURT:  Why don't you do that and I'll go through

17    everything.

18          Mr. Gilani, I have to say you are very reckless in

19    jumping to conclusions about misconduct by the other side.

20    This has reared its head again and again.  I don't really

21    understand why you are pursuing this litigation in the way you

22    are.  When we have these conferences, you seem to be a

23    perfectly reasonable, intelligent person, but then you file

24    these lurid allegations.  You know, if you were not pro se, you

25    would probably have faced sanctions by now.  You're pro se.  I

202081glacf

```
 1    have to make allowances for that and I'm doing it, but please

 2    be cautious going forward.

 3              MR. GILANI:  Sure.

 4              THE COURT:  Once again, if you want to file anything

 5    else on the docket before me, make a brief written letter

 6    request seeking leave to do it.  There is a three-page limit,

 7    including exhibits.  Do you understand?

 8              MR. GILANI:  Yes, your Honor.

 9              THE COURT:  All right.  I will take the "spoliation"

10    matter under advisement.

11              Is there anything else that we need to address this

12    afternoon?

13              Mr. Campsen?

14              MR. CAMPSEN:  Your Honor, this is Mr. Campsen.

15              Just back on the spoliation motion, for the Court's

16    convenience as it looks at it, regarding the Q2, I did want to

17    just make a quick comment.

18              Attached to Exhibit B1, which is document 75-2 --

19              THE COURT:  All right.  Let me just -- I've got a

20    printed copy of the docket here, so it's -- tell me again where

21    it is.

22              MR. CAMPSEN:  It's in our response, docket 75,

23    document 2.  75-2.

24              THE COURT:  B1.

25              MR. CAMPSEN:  B1.
```

202081ghlcf

1        THE COURT:  Got it.

2        MR. CAMPSEN:  I just want to explain to the Court

3   what that is after listening to the conversation, after

4   listening to Mr. Gilani.  He's saying -- and again, what he's

5   saying is demonstrably false.  And very quickly, I'll point it

6   out.  He's saying that his Q2 review with the lower scores and

7   everything was totally fabricated and he's got his own -- or,

8   I'm sorry, with the higher scores is totally fabricated and

9   he's got his own review that he's produced as an exhibit that

10  has the lower scores, and when you go to Exhibit B, it's an

11  e-mail chain from oldest to newest and the very first e-mail in

12  that is a February 13th e-mail.  And this is briefly explained

13  in my papers, but just to point out to the Court, he gets that

14  from his manager, Steve Evans.  He gets this review on February

15  13th.  He responds on February 20th with a lengthy e-mail

16  saying I deserve higher reviews.

17       THE COURT:  Right.  And then they say we agree you

18  should get a higher score.

19       MR. CAMPSEN:  Yes.  He gets a higher score.

20       But what's important about the alteration -- the

21  spoliation accusation is, within his e-mail, he specifically

22  highlights in green -- unfortunately, it didn't come out in

23  color, but you'll see the highlighting -- specific points that

24  he wants included from the old -- in the new revised review,

25  and those are specifically included in the review that was

1    ultimately sent to him on February 26th.  Those exact points

2    are dumped into the new final review, which is what we produced

3    and what he's saying that we altered.  And so it's really

4    nonsensical to say that we altered it because it was a revision

5    requested by him that gave him higher scores and specifically

6    included the positive highlights, or whatever you want to call

7    it, that he requested.  Those were directly put in, so you can

8    actually compare his requests to the specific categories I've

9    identified in the papers and you can see exactly what was

10   requested and what was put in.  So to say we altered it, it's

11   only true in the sense that we revised it per his request two

12   years ago, but that was the final document.  He's relying on

13   the original unrevised document per his request.

14          So, because that wasn't clear in the papers, I just

15   wanted to make that clear -- quickly clear here today.

16          THE COURT:  All right.  I want to look at all of

17   this, and I'll reserve on that.

18          Mr. Gilani, there are a couple of other things on the

19   docket that you have sort of filed documents without real

20   explanation.  Docket 76.  It appears to be a transcript of your

21   termination and some other transcripts.  This relates to your

22   motion to amend?

23          MR. GILANI:  Yes.  This -- so --

24          THE COURT:  Okay.  And, likewise, yesterday you filed

25   a letter with documentation relating to your herniated-disk

 1    issue.  That, likewise, relates to your motion to amend?

 2              MR. GILANI:  No.  That's not.  That's -- that's part

 3    of the motion, yeah.  There is -- there is an item on that one

 4    that's a part of the motion to amend, your Honor, yes.

 5              THE COURT:  So that -- I just want to understand why

 6    you're sending these things to me.  That's why you're sending

 7    them, because you think they're germane to your motion to

 8    amend?

 9              MR. GILANI:  That is correct, your Honor.

10              THE COURT:  Okay.

11              Is there anything outstanding -- anything else

12    outstanding that we need to talk about this afternoon?

13              Mr. Gilani?

14              MR. GILANI:  Yes.

15              So, your Honor, it would be excellent if defendant

16    send me the Word document of my 2000 what you call quarter 2

17    review, 2016 quarter 2 review, and a Word document of quarter 3

18    review, which they have.  They claim they have it.

19              The reason -- and then the reason what I'm requesting

20    that, because the Word document has integrated into that one --

21    it shows when was created and when was that documented, and

22    that -- that -- I can attempt to get that document.  I mean,

23    that will -- if that is the case, I can get those two Word

24    documents for quarter 2 and quarter 3.  And that's what I said

25    to Mr. Campsen yesterday on his documentation, what he filed.

```
 1   He send out, you know, whatever the -- looks like the e-mails
 2   were crafted or whatever.  I'm not accusing, I'm just alleging
 3   that.
 4            MR. CAMPSEN:  Well, you did accuse me of altering
 5   those, so let's be clear, in a court filing again.  You did.
 6            MR. GILANI:  So basically what I said to him
 7   yesterday before he filed, I said I agree -- these are the
 8   facts I agree.  I have not responded.  I said these are the
 9   facts, but if you want to table this one and get resolution,
10   forward me the messages, original messages and e-mails and the
11   Word document, and then I can validate that or I can get
12   validated from outside.
13            THE COURT:  Are you going to withdraw your motion and
14   your allegations of alteration if --
15            MR. GILANI:  If I can --
16            THE COURT:  -- you receive it?
17            MR. GILANI:  Yes.  If I get the Word document and the
18   e-mail messages, what he's sending me, I will validate it and I
19   will withdraw, because there's no sense if it shows validation
20   from the attending party that it was the true document.  And I
21   did not receive it.  So that will eliminate and I will
22   withdraw.
23            THE COURT:  Mr. Campsen, what do you want to do?
24            MR. CAMPSEN:  The problem that I have with this is I
25   don't know what he means by not validated.  We're giving him
```

1   the documents.

2          Now, the issue -- in one of his filings what he's --

3   what he's saying is -- one of his allegations of alteration is

4   he does a screen shot of the properties page and I believe -- I

5   can't remember which document it was offhand, but basically we

6   save these documents when they come in, and so if it shows that

7   it was created in June or July of 2020 because that's --

8          THE COURT:  That doesn't mean it was originally

9   created at that time.

10         MR. CAMPSEN:  Exactly, your Honor.

11         And when I go -- I have to -- all the documents now

12  are saved in my system, except for several e-mails that the top

13  date was archived when we saved them.  And I supplemented

14  yesterday, even though he was copied on his personal e-mail on

15  several of those, so I know he has them, because he produced

16  one recently.  So it's a really disingenuous argument.  But the

17  problem that I have with producing anything more is plaintiff's

18  objective belief that the records are altered with absolutely

19  no evidence, particularly with --

20         THE COURT:  All right.  I was looking to

21  short-circuit this, but if you don't want to do it, that's

22  fine.  File the additional filing that we talked about by, I

23  don't know, close of business tomorrow and I'll take a look at

24  all of this and deal with Mr. Gilani's improperly filed motion.

25         So, Mr. Gilani, anything else?

202081giacr

```
1              MR. GILANI:  So, your Honor, two questions.

2              One is do you know when will we have second amended

3    decision from you?

4              THE COURT:  It's not at the top of my list,

5    Mr. Gilani.

6              MR. GILANI:  Okay.

7              And the second -- third thing is that we have admit

8    and deny -- admit and deny date on September 2nd.  Now --

9              THE COURT:  Requests to admit?

10             MR. GILANI:  Requests to admit, yeah.

11             So the question I have how many I can file.  There's

12   limit or there's no limit?  I don't want to file something and

13   then have too many to file.

14             THE COURT:  How many do you want to file?

15             MR. GILANI:  I have started to create.  There's a lot

16   of admission have to be done.  Right?  So I -- right now, I

17   would say around one hundred.

18             THE COURT:  That sounds like too many to me,

19   Mr. Gilani.

20             MR. GILANI:  Okay.  How many will you --

21             THE COURT:  You know, I can't decide this in the

22   abstract, but that sounds -- without seeing what you're

23   requests are.  If they're routine requests to admit the

24   validity of documents or something like that, that's one thing,

25   but if you're trying to prove your case through requests to
```

2020bigilaci

```
1    admit, you really can't do that.

2              MR. GILANI:  So should I send it to you first?

3              THE COURT:  No, no, no, no.  You should send them to

4    defense counsel.  But maybe you want to confer about it before

5    you send it just to sort of try to short-circuit any further

6    dispute about it.

7              MR. GILANI:  Okay.

8              THE COURT:  Mr. Campsen, do you have a view about

9    this?

10             MR. CAMPSEN:  I'll agree with your Honor.  We can try

11   to talk about it.  I mean, a hundred is a lot.  And I think the

12   way things are written, I know it's going to be confusing and

13   difficult to get through.  So that's --

14             THE COURT:  Yes.  I mean, you know, there are cases

15   in which a hundred would be perfectly reasonable if it's

16   eliminating authentication, witnesses or something like that,

17   but if it's argumentative stuff, which I've got a feeling it's

18   going to be, that's out of line.  But I will leave it to

19   Mr. Gilani to take these comments into consideration.  Counsel

20   perhaps want to confer with Mr. Gilani about what he

21   contemplates in the way of requests to admit, and then if

22   there's a dispute, I'll resolve it.

23             So you got a couple of depositions coming up.  And I

24   will review this motion, as I indicated.  And I'm going to give

25   you a call back in about a month's time.
```

```
 1              MR. CAMPSEN:  Thank you, your Honor.

 2              Are we scheduling today or should we just look for a

 3    notice from the Court?

 4              THE COURT:  No, I'm going to schedule.  Let me just

 5    look at my calendar.

 6              How about Thursday, September 24th at 11?

 7              MR. GILANI:  I'm good.

 8              MR. CAMPSEN:  Yes, your Honor.

 9              THE COURT:  Terrific.  I'll talk to everybody then.

10              Go ahead.

11              MR. CAMPSEN:  One last logistics point.

12              So I'm going to go ahead and right now I'm going to

13    file that.  I think it's four, maybe five pages, that

14    supplemental e-mail chain with the Q3 review.

15              THE COURT:  Yes.

16              MR. CAMPSEN:  Can I just file it as a line

17    supplementing my opposition and I'll link it back to that

18    docket number?  Would that be sufficient?

19              THE COURT:  That's fine, that's fine.

20              MR. CAMPSEN:  Okay.  Thank you, your Honor.

21              THE COURT:  Okay.  Very good.  Thank you all.

22              MR. GILANI:  Thank you.

23              MR. CAMPSEN:  Thank you, your Honor.

24                                ----

25
```